[S.F. No. 24675. Dec. 27, 1984.]

ALEXANDRA FISHER et al., Plaintiffs and Appellants, v.
CITY OF BERKELEY et al., Defendants and Respondents.

COUNSEL

James R. Parrinello, John E. Mueller, Christiane T. Riess, Dobbs & Nielsen, Nielsen, Hodgson, Parrinello & Mueller and Peter J. Donnici for Plaintiffs and Appellants.

Jon D. Smock, Wilbur H. Haines III, Stephen L. Jones, Stacey & Jones, Tuttle & Taylor, Joseph R. Austin, David B. Babbe, Biddle & Hamilton, W. Craig Biddle, Ira Reiner, City Attorney (Los Angeles), Claudia McGee Henry, Assistant City Attorney, Michael S. Woodward, Deputy City Attorney, Latham & Watkins, Stephen L. Jones and George Kimball as Amici Curiae on behalf of Plaintiffs and Appellants.

Myron Moskovitz, Ann Juergens, Jeffrey A. Walter, Natalie E. West, City Attorney, and Frederick W. Bray, Senior City Attorney, for Defendants and Respondents.

James R. Grow, Michael Heumann, Stephen P. Wiman, Marsha Jones Moutrie, Robert M. Myers, City Attorney (Santa Monica), Stephen S. Stark, Assistant City Attorney, Karl M. Manheim, Deputy City Attorney, Robert J. Logan, City Attorney (San Jose), John W. Witt, City Attorney (San Diego), and George Agnost, City Attorney (San Francisco), as Amici Curiae on behalf of Defendants and Respondents.

OPINION

**MOSK, J.**—Plaintiffs, a group of landlords who own property in the City of Berkeley, appeal from a judgment of the Alameda County Superior Court holding defendants' rent control ordinance constitutional on its face. We substantially affirm the judgment.

Plaintiffs claim that defendants' ordinance conflicts with, and hence is preempted by, federal antitrust law because it is a combination that unreasonably restrains interstate commerce in violation of section 1 of the Sherman Antitrust Act (Act or Sherman Act). (15 U.S.C.) They also claim that it constitutes monopolization, or attempted monopolization, in violation of section 2 of the Act. (*Ibid.*) Although price fixing by private business enterprises is clearly illegal per se, we hold that the per se rule of illegality does not apply to the municipal defendants' price-fixing ordinance in this case. Nor can such a municipal regulation be reviewed pursuant to the traditional rule of reason, under which validity would be judged solely by the regulation's effect on competition. Instead, we have determined that when

the validity of an ordinance is challenged under the federal antitrust laws, courts must adapt traditional antitrust rules in order to accommodate municipal governments' legitimate interest in enacting economic and social regulations concerning local health, safety and welfare. We conclude that if a municipal regulation has a proper local purpose, is rationally related to the municipality's legitimate exercise of its police power, and operates in an evenhanded manner, it must be upheld against a claim that it conflicts with section 1 or 2 of the Sherman Act unless the plaintiff demonstrates that the city's purposes could be achieved as effectively by means that would have a less intrusive impact on federal antitrust policies. No such means have been proposed. Under the foregoing test the ordinance in question has not been shown to conflict with federal antitrust laws.

We also conclude that defendants' ordinance is facially constitutional under both the federal and state due process clauses: a rent control ordinance is valid if it guarantees each landlord a fair return on his investment; it need not guarantee a fair return on the value of property. Furthermore, the ordinance on its face provides for reasonably prompt access to adjustment procedures for those landlords seeking to increase rents. Additionally, we conclude that the rent withholding provisions of the ordinance do not violate landlords' due process rights, nor are such provisions preempted by general state law. Finally, however, we have determined that the ordinance is invalid to the extent it purports to create an evidentiary presumption affecting the burden of proof in regard to retaliatory evictions, but that such a provision is severable, and does not affect the validity of the remainder of the ordinance.

### Background and Procedure

In June 1980 the Berkeley electorate enacted initiative "Measure D," the "Rent Stabilization and Eviction for Good Cause Ordinance," (hereafter ordinance). The ordinance affects approximately 23,000 rental units.

Section 3 sets out the purpose of the ordinance: It is intended "to regulate residential rent increases in the City of Berkeley and to protect tenants from unwarranted rent increases and arbitrary, discriminatory, or retaliatory evictions, in order to help maintain the diversity of the Berkeley community and to ensure compliance with legal obligations relating to the rental of housing. This legislation is designed to address the City of Berkeley's housing crisis, preserve the public peace, health and safety, and advance the housing policies of this City with regard to low and fixed income persons, minorities, students, handicapped, and the aged."

Section 5 exempts from the ordinance government-owned units, transient units, cooperatives, hospitals, certain small owner-occupied buildings, and

all newly constructed buildings. Section 6 establishes a rent stabilization board (Board) of nine commissioners, and sets out its powers, duties, rules and procedures, as well as a means of ending rent control if the city's vacancy rate surpasses 5 percent. Section 8 requires landlords to register with the Board, furnish specified information, and pay a registration fee for each unit.

Section 10 establishes base rent ceilings[1] that landlords may not exceed except as permitted by the Board under sections 11 and 12. Section 11 provides for annual general adjustment of rent ceilings to cover increases or decreases relating to utilities and taxes. In making such general adjustment, the Board is given authority to adopt a general formula based on available data relating to such expenses. If a landlord is not satisfied with this general increase, he may petition the Board for an individual adjustment under section 12. In ruling on this petition the Board must consider many nonexclusive factors, including a landlord's individual costs, but in no event may it deny a rent increase needed to allow a landlord a "fair return on investment."

Section 13 prohibits evictions except for enumerated factors constituting "good cause." Section 14 prohibits retaliatory evictions, and states that any eviction action taken against a tenant within six months of the tenant's assertion of rights under the ordinance shall be "presumed" to be retaliatory.

Section 15 sets out remedies, including rent withholding, both for a landlord's violation of rent ceilings and failure to register. Section 16 is a severability clause. Section 17 declares that the provisions of the ordinance may not be waived. Section 18 provides for judicial review of any act of the Board.

Plaintiffs filed suit in August 1980 seeking injunctive and declaratory relief against enforcement of the ordinance. They alleged the ordinance is unconstitutional on its face and as applied. The trial court granted defendants' motion for judgment on the pleadings, declaring the ordinance constitutional on its face. The court granted plaintiffs leave to amend to allege facts showing that the ordinance is unconstitutional as applied, but plaintiffs subsequently dismissed this aspect of the complaint. Plaintiffs appeal from the trial court's order granting defendants judgment on the pleadings. The

---

[1]The base rent ceiling is the rent as of May 31, 1980. Regarding rental units for which there was no periodic rent in effect on that date, or during the six months preceding that date, the base rent ceiling is a "good faith estimate" of the median rent in effect for comparable units in the City of Berkeley on May 31, 1980.

sole question before us, therefore, is whether the ordinance is invalid on its face.[2]

After the case was fully briefed on the merits in the Court of Appeal, but before that court rendered its decision, the United States Supreme Court decided *Community Communications Co.* v. *City of Boulder* (1982) 455 U.S. 40 [70 L.Ed.2d 810, 102 S.Ct. 835], holding a home rule municipality subject to federal antitrust scrutiny. We granted hearing, and soon thereafter the issue of the effect of *Boulder,* and antitrust law generally, was raised for the first time by amicus curiae. Both parties and additional amici curiae for both parties were granted leave to file, and have filed, supplemental briefs addressing inter alia antitrust issues generally, and the *Boulder* issue specifically.

Therefore, although plaintiffs claim the ordinance is facially invalid in whole or in part on due process and statutory grounds, they also assert that an alleged conflict between the ordinance and federal antitrust law presents a threshold issue dispositive of this appeal. ██ ██ ██ ██ ██ ██ Defendants likewise request that we address and resolve plaintiffs' antitrust contentions.[3] Because of the extreme importance of the issues presented, we proceed to analyze plaintiffs' antitrust claims.

---

[2]While the case was pending on appeal the Berkeley electorate enacted the "Tenants' Rights Amendments Act of 1982," revising certain sections of the ordinance, including two sections relevant to our inquiry in this case: section 11, quoted *post* at pages 687-689, footnote 44, and section 14, quoted *post* at page 693, footnote 54. Although the amendment was not before the trial court at the time it held the ordinance facially constitutional, any issues that may arise as a result of the amendments are questions of law and thus may be properly resolved by this court in determining facial validity. Therefore we will review the regulation as amended.

[3]It is well settled that a court will consider on appeal a new point of law decided while the appeal is pending. (*Claremont Imp. Club* v. *Buckingham* (1948) 89 Cal.App.2d 32, 33 [200 P.2d 47].) Although prior to *Boulder* there existed a plausible basis for alleging a municipal regulation to be in conflict with antitrust laws pursuant to *City of Lafayette* v. *Louisiana Power & Light Co.* (1978) 435 U.S. 389 [55 L.Ed.2d 364, 98 S.Ct. 1123] (discussed *post,* pp. 658-659), that case involved proprietary, rather than regulatory conduct, and hence such a claim could not reasonably have been expected to survive demurrer. In a real sense, therefore, the spectre of antitrust scrutiny of municipal regulatory conduct first arose in *Boulder.*

It is also established that on appeal from judgments granting or denying an injunction, the court applies the law that is current at the time of the decision. (*Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492, 496-497 [254 P.2d 497] [congressional amendment of antitrust laws while appeal pending given effect to exempt a manufacturer from Sherman Act § 1 charges]; see also *M Restaurants, Inc.* v. *San Francisco Local Joint Exec. Bd. Culinary etc. Union* (1981) 124 Cal.App.3d 666, 673 [177 Cal.Rptr. 690].) Further, we have held that parties may advance new theories on appeal when the issue posed is purely a question of law based on undisputed facts, and involves important questions of public policy. (*Frink* v. *Prod* (1982) 31 Cal.3d 166, 170 [181 Cal.Rptr. 893, 643 P.2d 476] (plurality decision); *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 324 [182 Cal.Rptr. 506, 644 P.2d 192]; *UFITEC, S.A.* v. *Carter* (1977) 20 Cal.3d 238, 249, fn. 2 [142 Cal.Rptr. 279, 571

## I. Antitrust Issues

In *Birkenfeld* v. *City of Berkeley* (1976) 17 Cal.3d 129 [130 Cal.Rptr. 465, 550 P.2d 1001], we held Berkeley's former rent control ordinance facially unconstitutional because its procedures for rent adjustment were "inexcusably cumbersome" and would have deprived landlords of due process if permitted to take effect. (*Id.* at p. 173.) Before reaching that conclusion, however, we addressed the threshold question of the city's power to provide for rent control. We observed that our Constitution confers on all cities and counties the power to "make and enforce within [their] limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws" (Cal. Const., art. XI, § 7) and noted that "[a] city's police power under this provision can be applied only within its own territory and is subject to displacement by general state law but otherwise is as broad as the police power exercisable by the Legislature itself." (17 Cal.3d at p. 140.) Although there is extensive regulation governing various aspects of landlord-tenant relations, "California has no state rent control statute." (*Id.* at p. 141.) We therefore concluded that the Berkeley ordinance was within the city's police power: there was "no legislative indication of 'a paramount state concern [which] will not tolerate further or additional local action.'" (*Id.* at p. 142, quoting *In re Hubbard* (1964) 62 Cal.2d 119, 128 [41 Cal.Rptr. 393, 396 P.2d 809].)

Conceding that local rent control is not preempted by state law, plaintiffs champion federal antitrust law in order to attack *Birkenfeld*'s premise that the police power of a city is as broad as that power exercisable by the Legislature.

Plaintiffs observe that although our state Constitution grants cities police power equal to that of the state, we are duty-bound under the supremacy clause of the federal Constitution (art. VI, cl. 2) to invalidate a municipal regulation that on its face violates paramount federal law. (*Sail'er Inn, Inc.* v. *Kirby* (1971) 5 Cal.3d 1, 10-11 [95 Cal.Rptr. 329, 485 P.2d 529, 46

P.2d 990]; *Wong* v. *Di Grazia* (1963) 60 Cal.2d 525, 532, fn. 9 [35 Cal.Rptr. 241, 386 P.2d 817]; *Tyre* v. *Aetna Life Ins. Co.* (1960) 54 Cal.2d 399, 405 [6 Cal.Rptr. 13, 353 P.2d 725]; *Burdette* v. *Rollefson Construction Co.* (1959) 52 Cal.2d 720, 725-726 [344 P.2d 307].) In *Di Grazia, supra,* we rejected defendants' contention that because an issue regarding the rule against perpetuities had not been raised at trial, it would be improper for this court to address the question on appeal. Justice Tobriner, writing for the court, suggested that defendants' contention was meritless, and that "in any event, the issue as to the rule against perpetuities [is of] considerable public interest; it has been fully argued before this court; we, accordingly, dispose of the issue on its merits." (60 Cal.2d 525, 532, fn. 9.) We believe that the validity of municipal rent controls under antitrust law raises extremely significant issues of public policy and public interest. (See, e.g., Goodrich, *The Limits of Municipal Power* (Mar. 1984) 4 Cal.Law. 26; Spiegel, *Local Governments and the Terror of Antitrust* (1983) 69 A.B.A.J. 163.)

A.L.R.3d 351].) They argue that (1) the city's ordinance, on its face, conflicts with federal antitrust law; that (2) under *Boulder,* the ordinance is not exempt from antitrust scrutiny, and hence (3) defendants have no authority to enforce the regulation in question. ▉ We clearly have jurisdiction to decide such claims. (*Rice* v. *Norman Williams Co.* (1982) 458 U.S. 654, 659-661 [73 L.Ed.2d 1042, 1049-1051, 102 S.Ct. 3294]; see *Rice* v. *Alcoholic Bev. etc. Appeals Bd.* (1978) 21 Cal.3d 431, 439-446 [146 Cal.Rptr. 585, 579 P.2d 476, 96 A.L.R.3d 613] [state retail price maintenance scheme for distilled liquor invalidated under § 1 of the Sherman Act]; *Midcal Aluminum, Inc.* v. *Rice* (1979) 90 Cal.App.3d 979, 982-984 [153 Cal.Rptr. 757] [enjoining enforcement of state wholesale price maintenance scheme for wine as invalid under § 1 of the Act], affd. *sub nom. California Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.* (1980) 445 U.S. 97 [63 L.Ed.2d 233, 100 S.Ct. 937]; *Capiscean Corp.* v. *Alcoholic Bev. etc. Appeals Bd.* (1979) 87 Cal.App.3d 996, 999-1000 [151 Cal.Rptr. 492] [invalidating state retail price maintenance scheme under *Rice* v. *Alcoholic Bev. etc. Appeals Bd., supra,* 21 Cal.3d 431].)[4]

### A. State Action, Municipal Action, and Federal Antitrust Law

In order to prohibit private businesses from practicing various anticompetitive activities in interstate commerce, nearly a century ago the United States Congress exercised its broad authority under the commerce clause (U.S. Const., art. I, § 8, cl. 3) to enact the Sherman Act. (Pub.L. No. 51-190, 26 Stat. 209 (1890) codified as amended at 15 U.S.C. §§ 1-7; see *Parker* v. *Brown* (1943) 317 U.S. 341, 351 [87 L.Ed. 315, 326, 63 S.Ct. 307], citing Remarks of Sen. Sherman, 21 Cong. Rec. 2457, 2562 (1890).) Two sections of the Act are relevant to the present case. Section 1 declares all contracts, combinations or conspiracies in restraint of interstate commerce to be illegal. Section 2 declares that the act of monopolizing, or attempting to monopolize any part of interstate commerce is illegal. Quite obviously, if defendants' ordinance conflicts with the Act, and further, if it is not exempt from antitrust scrutiny, the supremacy clause of the federal Constitution requires that we declare the ordinance invalid.

---

[4]We are aware that some decisions broadly declare that "state courts have no jurisdiction to construe or enforce the federal antitrust laws." (*Classen* v. *Weller* (1983) 145 Cal.App.3d 27, 34, fn. 2 [192 Cal.Rptr. 914] [concession by counsel]; *Union Oil* v. *Chandler* (1970) 4 Cal.App.3d 716, 726 [84 Cal.Rptr. 756].) Plaintiffs in this case, however, do not seek a private remedy against defendants; instead, they seek to enjoin enforcement of a local regulation alleged to be facially unconstitutional under the supremacy clause. It is clear that state courts may both construe and "enforce" the federal antitrust statutes for the purpose of ruling on such facial attacks. (*Rice* v. *Norman Williams Co.* (1982) 458 U.S. 654, 658, fn. 4 [73 L.Ed.2d 1042, 1049, 102 S.Ct. 3294] revg. on other grounds *Norman Williams Co.* v. *Rice* (1980) 108 Cal.App.3d 348, 354, fn. 2 [166 Cal.Rptr. 563].) We do not construe *Classen* or *Union Oil* to suggest that state courts lack jurisdiction to review facial attacks premised on alleged conflict with federal antitrust laws.

Over 40 years ago, the Supreme Court in *Parker, supra,* held this state's raisin marketing program, which restricted competition and maintained prices in order to protect the local raisin market, was not subject to federal antitrust scrutiny. The court found "nothing in the language of the Sherman Act or in its history which suggests that its purpose was to restrain a state or its officers or agents from activities directed by its legislature. In a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress. [¶] The Sherman Act makes no mention of the state as such, and gives no hint that it was intended to restrain state action or official action directed by a state. . . . [¶] There is no suggestion of a purpose to restrain state action in the Act's legislative history." (317 U.S. at pp. 350-351 [87 L.Ed. at p. 326].) The *Parker* court concluded that "[t]he state in adopting and enforcing the . . . program . . . as a sovereign, imposed the restraint as an act of government which the Sherman Act did not undertake to prohibit." (*Id.* at p. 352 [87 L.Ed. at p. 327].)

In a series of cases over the last decade the United States Supreme Court has considered the extent to which private, or nongovernmental, business enterprises may come under the protection conferred in *Parker*.[5] And in two

---

[5]In *Goldfarb* v. *Virginia State Bar* (1975) 421 U.S. 773 [44 L.Ed.2d 572, 95 S.Ct. 2004], the court held minimum fee schedules for lawyers enforced by the state bar subject to scrutiny under the Act. The state bar's status as an agent of the state supreme court did not make its fee schedule "state action" because such anticompetitive conduct was not "compelled by direction of the State acting as a sovereign." (*Id.* at p. 791 [44 L.Ed.2d at p. 587].) The court again denied protection from antitrust scrutiny in *Cantor* v. *Detroit Edison Co.* (1976) 428 U.S. 579 [49 L.Ed.2d 1141, 96 S.Ct. 3110]. In that case the state public utility commission approved an anticompetitive tariff requiring the defendant to provide its customers "free" light bulbs. Rejecting the utility's argument that commission approval "compelled" it to operate the light bulb distribution program despite its anticompetitive effects, the court held that mere approval was insufficient to invoke state action protection because it signified only state neutrality toward the conduct in question. (*Id.* at p. 585 [49 L.Ed.2d at pp. 1146-1147].)

In the following year, the court recognized state action protection in *Bates* v. *State Bar of Arizona* (1977) 433 U.S. 350 [53 L.Ed.2d 810, 97 S.Ct. 2691]. In *Bates* the state supreme court, acting as the state's ultimate authority over the practice of law, promulgated American Bar Association-sponsored disciplinary rules banning lawyer advertising. The United States Supreme Court held that "[a]lthough the State Bar plays a part in the enforcement of the rules, its role is completely defined by the court; the [State Bar] acts as the agent of the court under its continuous supervision." (*Id.* at p. 361 [53 L.Ed.2d at p. 822].) The court concluded that the state's anticompetitive policy was "clearly and affirmatively expressed" (*id.* at p. 362 [53 L.Ed.2d at p. 822]), and that the state bar's conduct was sufficiently compelled by the state to warrant protection from antitrust scrutiny. (*Id.* at p. 363 [53 L.Ed.2d at pp. 822-823].)

In *New Motor Veh. Bd. of Cal.* v. *Orrin W. Fox, Co.* (1978) 439 U.S. 96 [58 L.Ed.2d 361, 99 S.Ct. 403], and *California Retail Liquor Dealers Ass'n* v. *Midcal Aluminum, Inc.* (1980) 445 U.S. 97 [63 L.Ed.2d 233, 100 S.Ct. 937], the court again addressed the state action exemption as it applies to private business enterprises. In *Orrin Fox* the court held that a state-imposed scheme that restricted intrabrand competition in the sale of new auto-

recent decisions, the court has addressed the conditions under which local governments may gain *Parker* protection. The first case, *City of Lafayette v. Louisiana Power & Light Co.* (1978) 435 U.S. 389 [55 L.Ed.2d 364, 98 S.Ct. 1123], involved two Louisiana municipalities that owned and operated their own electric utility systems. Louisiana Power alleged that the municipalities had engaged in illegal tying arrangements with their customers.

The majority rejected the municipalities' contention that antitrust laws were intended to protect only against abuses by private businesses and are not applicable to municipalities that "exist to serve the public weal." (*Id.* at p. 403 [55 L.Ed.2d at p. 376].) The court observed that the defendants were not motivated solely by desire to benefit the public. Instead, like "[e]very business enterprise" (*ibid.*), their decisions may be motivated by the goal of "realizing maximum benefits to [themselves] without regard to extraterritorial impact and regional efficiency." (*Id.* at p. 404 [55 L.Ed.2d at p. 377].) A majority therefore rejected the argument that the two municipalities—both of which "act[ed] as owners and providers of services" (*id.* at p. 408 [55 L.Ed.2d at p. 379]), were immune from antitrust scrutiny.

A plurality opinion by Justice Brennan then rejected the contention that municipalities, simply by reason of their status as such, are exempt from antitrust laws. "*Parker*'s limitation of the exemption . . . to 'official action directed by [the] state,' arises from the basis for the 'state action' doctrine—that given our 'dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority,' 317 U.S., at 351, a congressional purpose to subject to antitrust control the States' acts of government will not lightly be inferred. To extend that doctrine to municipalities would be inconsistent with that limitation. Cities are not themselves sovereign; they do not receive all the federal deference of the States that create them." (435 U.S. at pp. 411-412 [55 L.Ed.2d at p. 382].) Still, the plurality suggested, a municipality

---

mobiles was exempt from scrutiny under the antitrust laws because the program operated under "clearly articulated and affirmatively expressed" legislative guidelines. (439 U.S. at p. 109 [58 L.Ed.2d at p. 376].) In *Midcal,* on the other hand, the court held that a state-imposed maximum resale price maintenance system, affecting all wine producers and wholesalers in this state, was not exempt from antitrust laws. Although the scheme was "'clearly articulated and affirmatively expressed as state policy,'" it was not "'actively supervised' by the State itself." (445 U.S. at p. 105 [63 L.Ed.2d at p. 243], quoting *Lafayette, supra,* 435 U.S. 389, 410 [55 L.Ed.2d 364, 381] (plur. opn.).)

Most recently, in *Hoover* v. *Ronwin* (1984) 466 U.S. 558 [80 L.Ed.2d 590, 104 S.Ct. 1989], the court, on a four-to-three vote, found Arizona state bar examiners exempt from antitrust scrutiny. The majority held the examiners' actions constituted action of the sovereign itself, and hence exempt from antitrust scrutiny under *Parker* (*id.* at p. — [80 L.Ed.2d at p. 599, 104 S.Ct. at p. 1995]). Therefore, the majority found it unnecessary to consider whether the alleged anticompetitive policy was "clearly articulated" or "actively supervised." (*Id.* at p. — [80 L.Ed.2d at pp. 599-600, 104 S.Ct. at pp. 1995-1996].)

could come under the *Parker* exemption if it acts pursuant to state policy to displace competition with regulation or monopoly public service. Deviating slightly from the court's requirement in the private business enterprise cases that the state must have "compelled" the conduct in order for the activity to come within the *Parker* exemption (*ante,* pp. 657-658, fn. 5), the plurality stated that state direction or authorization of the anticompetitive conduct would be sufficient to trigger the exemption for municipalities. (*Id.* at p. 417 [55 L.Ed.2d at pp. 385-386].)[6]

In a concurrence, Chief Justice Burger emphasized his view that the municipalities' ownership and operation of utility companies constituted business activities pursuant to their proprietary functions (*id.* at p. 422-425 [55 L.Ed.2d at pp. 388-391]), and hence any question of exemption should meet the more stringent "compulsion" standard applicable to private parties seeking the protection of *Parker.* The Chief Justice appeared to suggest that municipalities' nonproprietary activities should be exempt from antitrust scrutiny.

Four years later the United States Supreme Court decided *Community Communications Co.* v. *City of Boulder, supra,* 455 U.S. 40. The city, apparently acting in its regulatory capacity, placed a moratorium on expansion of plaintiff's cable television service for three months in order to allow competing companies to make bids to enter a new geographic market under a proposed model ordinance.[7] Plaintiff sued to enjoin the moratorium, claiming inter alia that it constituted a conspiracy between the city and a potential competitor, and that it restrained trade in violation of section 1 of the Sherman Act. The district court granted an injunction, rejecting the city's argument that its actions were protected as a valid exercise of its police power, or that it was exempt from antitrust scrutiny under *Parker.* A divided Tenth Circuit Court of Appeals reversed, distinguishing *Lafayette* on the ground that, in contrast to the activity in that case, "no proprietary interest of the City is here involved." (630 F.2d 704, 708.) The United States Supreme Court in turn reversed, holding over the dissent of Justice Rehnquist that the city's ordinance "cannot be exempt from antitrust scrutiny unless it constitutes the action of the State . . . itself in its sovereign capacity, see *Parker,* or unless it constitutes municipal action in furtherance or implementation of clearly articulated and affirmatively expressed state policy, see *City of Lafayette* . . . ." (*Boulder, supra,* 455 U.S. 40, 52 [70

---

[6]Four justices dissenting, led by Justice Stewart, maintained that exemption applied because "petitioners are governmental bodies, not private persons, and their actions are 'act[s] of government' which *Parker* v. *Brown* held are not subject to the Sherman Act." (435 U.S. at p. 426 [55 L.Ed.2d at p. 391].)

[7]Plaintiff was assignee of a 20-year, revocable, nonexclusive permit to conduct a cable television business within the city limits. (455 U.S. at p. 44 [70 L.Ed.2d at p. 814].)

L.Ed.2d 810, 819].) The court rejected the city's argument that merely because the state, under its home rule amendment, had vested the city with " ' "*every power* theretofore possessed by the legislature . . . in local and municipal affairs" ' " (*id.* at p. 52 [70 L.Ed.2d at p. 819], italics in original), regulation of cable television was therefore an " 'act of government' performed by the city *acting as the state* in local matters . . . ." (*Id.* at p. 53 [70 L.Ed.2d at p. 820], italics in original.) Granting of home-rule power, the court reasoned, merely indicates neutrality respecting the challenged actions, and does not satisfy the " 'clear articulation and affirmative expression' " of state policy requirement. (*Id.* at p. 55 [70 L.Ed.2d at p. 821].) The court reiterated the *Lafayette* plurality's view that the *Parker* exemption is premised on sovereignty, and that because municipalities are not sovereign, they fall outside the exemption. (*Id.* at pp. 50-51 [70 L.Ed.2d at p. 818].)

Accordingly, much of the parties' energy in the present case has been directed toward arguing their respective views as to whether defendants' ordinance falls within or without the *Boulder* state action exemption.[8] Consideration of *Boulder*'s exemption standard at this stage in our analysis, however, is premature. Application of the state action exemption principle becomes necessary only after we determine that there is "truly a conflict between the Sherman Act and the challenged regulatory scheme." (*First American Title Co. of South Dakota* v. *South Dakota Land Title Ass'n* (8th Cir. 1983) 714 F.2d 1439, 1452; see also *Rice* v. *Norman Williams Co.*, *supra*, 458 U.S. 654, 662, fn. 9 [73 L.Ed.2d 1042, 1052]; *Midcal*, *supra*, 445 U.S. 97, 102 [63 L.Ed.2d 233, 241]; *Parker*, *supra*, 317 U.S. 341, 350 [87 L.Ed. 315, 325-326]; *Rice*, *supra*, 21 Cal.3d 431, 439-446; *Lewis-Westco & Co.* v. *Alcoholic Bev. etc. Appeals Bd.* (1982) 136 Cal.App.3d 829, 834-837 [186 Cal.Rptr. 552].)

### B. *Facial Validity of the Ordinance Under Section 1 of the Sherman Act*

▪ Plaintiffs contend that the ordinance, on its face, conflicts with, and hence is preempted by, section 1 of the Sherman Act. (See *ante*, fn. 8.)

---

[8]Justice Rehnquist, writing for the dissent in *Boulder*, correctly noted that the *Parker* court cast its decision in the language of preemption. (*Parker*, *supra*, 317 U.S. 341, 351 [87 L.Ed. 315, 326].) *Parker*, which was a suit to enjoin enforcement of a state statute, has been characterized by *Boulder* and *Lafayette*, however, as establishing a state action exemption from antitrust laws. (455 U.S. 40, 43 [70 L.Ed.2d 810, 814]; 435 U.S. 389, 394 [55 L.Ed.2d 364, 371].) Unlike *Parker*, both of these latter cases were private antitrust suits for damages, not invalidation of a regulation. In the court's most recent case in this area, *Rice* v. *Norman Williams Co.* (1982) *supra*, 458 U.S. 654, the plaintiffs sought to enjoin enforcement of one of this state's liquor statutes. Consistently with *Parker*, the court framed its analysis in terms of preemption. In view of these cases, we agree with plaintiffs and amici that the question in the present appeal is whether defendants' regulation conflicts with, and hence is preempted by, the Sherman Act.

That section states: "Every contract, combination . . . or conspiracy, in restraint of trade or commerce among the several States . . . is . . . declared to be illegal." (15 U.S.C. § 1.)

Defendants and amici broadly respond that no provision of the Act was intended to apply to city ordinances designed to protect or further local health, safety, or general welfare, and hence the ordinance in question cannot violate the antitrust laws. They suggest that only local legislation designed to achieve commercial or proprietary interests—either from city ownership of property or through fees or taxes pursuant to franchise awards—are properly subject to antitrust scrutiny.

Although defendants' view has rational appeal, we are bound by the United States Supreme Court's implicit rejection of that theory in *Lafayette* and *Boulder*. In both of those cases the court addressed the applicability of state action exemption to municipal defendants. However, in order to reach the question of exemption from antitrust laws, in both decisions the court necessarily assumed that each case presented a violation of antitrust laws. (E.g., *First American Title Co., supra,* 714 F.2d 1439, 1451-1452.) While standing alone, *Lafayette* could be read to support defendants' view that only the commercial activities of municipalities are subject to antitrust scrutiny (*Lafayette,* 435 U.S. 389, 418-426 [55 L.Ed.2d 364, 386-391], Burger, C. J., conc.), we must conclude that *Boulder* forecloses any argument that the Act does not apply to a municipality's "noncommercial" activities. The alleged anticompetitive activity in that case concerned merely the imposition of a three-month moratorium on expansion of petitioner's cable television franchise while the city studied the need for increased regulation. Whereas the facts of *Boulder* strongly suggest that the moratorium was imposed pursuant to the city's regulatory authority, still the court's resolution of the state action exemption issue necessarily assumed an antitrust violation; moreover, the court did not even mention the possibility of a broader, preliminary exemption from antitrust scrutiny for "nonproprietary" municipal activity.[9]

Therefore, we must conclude that the United States Supreme Court necessarily and implicitly rejected defendants' view in *Boulder*. (McMahon,

---

[9]In this regard, we must also reject defendants' attempt to distinguish *Boulder* on the ground that the city in that case stood to acquire revenues from its franchise awards. Again, it must be noted that the challenged activity in *Boulder* concerned not collection of franchise fees, but merely the city's imposition, under its regulatory powers, of a three-month moratorium on expansion of petitioner's franchise. Nowhere in the court's majority, concurring, or dissenting opinions is it even suggested that resolution of the case rested on defendants' "revenue generating" theory. If in fact the United States Supreme Court had found the city's apparent interest in collecting fees for its franchise awards to be determinative, we believe that court would have said so somewhere in its opinion.

*Recent Significant Developments in "State Action" and Noerr-Pennington Exemptions: From Boulder to the "Sham" Exception* (1983) 14 Toledo L.Rev. 531, 540-541.) As we shall explain below, however, defendants are correct when they assert that the antitrust laws are aimed chiefly at commercial activities. And, as demonstrated below, this fact must influence the question of how, and to what extent, traditional antitrust rules apply to municipal defendants.

We turn now to plaintiffs' claim under section 1 of the Sherman Act. To prove a facial conflict with section 1 in the present case, plaintiffs must establish as a matter of law (a) that two or more "persons" acted in concert, (b) that the activities complained of affect interstate commerce, and (c) that the action constitutes an unreasonable restraint on commerce.[10] ■ A court may invalidate an ordinance in the abstract "only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the statute." (*Rice* v. *Norman Williams Co., supra,* 458 U.S. 654, 661 [73 L.Ed.2d 1042, 1051].)

■ Both parties vigorously contest whether in this case plaintiffs can or cannot prove the requisite concerted action and effect on interstate commerce. Although we do not agree with plaintiffs' suggestion that these "technical" requirements should be ignored in a facial attack seeking "mere invalidation" instead of damages (*ante,* fn. 10), we need not address these issues now[11] because we have determined that, in any event, plaintiffs cannot prove that the ordinance on its face mandates an unreasonable restraint

---

[10]Plaintiffs and amici argue that a local enactment is preempted by federal law not only when its operation would bring it expressly within the federal statute, but also whenever its operation would frustrate the broad objectives that underlie federal legislation. (See *Hines* v. *Davidowitz* (1941) 312 U.S. 52, 67 [85 L.Ed. 581, 586-587, 61 S.Ct. 399] (the test of preemption is whether the state law stands "as an obstacle to the accomplishment . . . of the full purposes and objectives of Congress").) See generally, Posner, *The Proper Relationship Between State Regulation and the Federal Antitrust Laws* (1974) 49 N.Y.U.L.Rev. 693, 698-703 (suggesting that the federal policy of free and open competition can be applied to prevent the operation of state law that clearly transgresses the "spirit of the Sherman Act," "even if the conflict is not within the express language of the federal statute"). We are not convinced that such a broad view is warranted or that the United States Supreme Court has embraced it. Indeed, the court has recently indicated that it will not follow plaintiffs' approach: the court stated that "[a] state statute is not pre-empted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect" (*Rice* v. *Norman Williams Co., supra,* 458 U.S. 654, 659 [73 L.Ed.2d 1042, 1049]) and suggested that it will invalidate state legislation in the abstract "only if it mandates . . . a *violation* of the antitrust laws in all cases . . . ." (*Id.* at p. 661 [73 L.Ed.2d at p. 1051], italics added.) Because it *is necessary* to prove the requisite concerted action and interstate commerce elements in order to prove a violation of section 1, the court's statement must reasonably be construed to require proof of those elements even in a facial attack such as this.

[11]It is therefore unnecessary to discuss either the "intraenterprise" or the *Noerr/Pennington* issues raised in the briefs.

of trade and hence irreconciliably conflicts with section 1 of the Sherman Act. (458 U.S. at p. 661 [73 L.Ed.2d at p. 1051].)[12]

## 1. Unreasonable Restraint

### a. Application of Traditional Antitrust Law to Municipal Defendants

We recognize at the onset that this case forces us to wander off the map and travel cross country without the benefit of trail or compass. Although *Boulder* clearly held municipalities subject to antitrust laws, the court specifically declined to address the issue of the applicability of traditional antitrust rules or standards against which municipal defendants are to be judged. (*Boulder, supra,* 455 U.S. 40, 56, fn. 20 [70 L.Ed.2d 810, 822].) Significantly, however, the *Boulder* court strongly suggested that municipalities and private business enterprises may be subject to different standards: the court repeated *Lafayette*'s suggestion that " '[i]t may be that certain activities which might appear anticompetitive when engaged in by private parties, take on a different complexion when adopted by a local government.' " (*Ibid.,* citing *Lafayette, supra,* 435 U.S. 389, 417, fn. 48 [55 L.Ed.2d 364, 385].) Similarly, the *Boulder* dissent observed that under the majority's rule, the courts "must now adapt antitrust principles to adjudicate Sherman Act challenges to local regulation of the economy." (455 U.S. at p. 65 [70 L.Ed.2d at p. 828].) Anticompetitive conduct by a municipality in exercise of its legitimate police power is indeed of a "different complexion" than similar conduct engaged in by private business enterprises and therefore, as the *Boulder* court suggested, courts must adapt or modify the application of traditional antitrust rules when reviewing the acts of municipal defendants.

The United States Supreme Court has often noted that the purpose of antitrust law is the regulation of anticompetitive business practices. The Sherman Act relates to " 'business competition' " (*Apex Hosiery Co.* v. *Leader* (1940) 310 U.S. 469, 493, fn. 15 [84 L.Ed. 1311, 1323, 60 S.Ct. 982, 128 A.L.R. 1044]) and is designed to regulate "combinations of business and capital organized to suppress commercial competition . . . ." (*United States* v. *South-Eastern Underwriters Ass'n* (1944) 322 U.S. 533, 553 [88 L.Ed. 1440, 1458, 64 S.Ct. 1162]; see also *Parker, supra,* 317 U.S. 341, 351 [87 L.Ed. 315, 326]; 1 Kintner, Federal Antitrust Law (1980) § 4.18 [summarizing an exhaustive analysis of the legislative history of the Act]; cf. Bork, *Legislative Intent and the Policy of the Sherman Act* (1966) 9 J.L. & Econ. 7.) One commentator has observed that "[t]he Court

---

[12]Compare, Comment, *Sherman Act "Jurisdiction" in Hospital Staff Exclusion Cases* (1983) 132 U.Pa.L.Rev. 121, 142.

has been reluctant to apply antitrust laws to the conduct of those who are not engaged in commercial activities." (Vanderstar, *Liability of Municipalities Under the Antitrust Laws: Litigation Strategies* (1983) 32 Cath.U.L.Rev. 395, 397-398.) Indeed, the court has said that the Act "is aimed primarily at combinations having commercial objectives and is applied only to a very limited extent to organizations, like labor unions, which normally have other objectives." (*Klor's, Inc.* v. *Broadway-Hale Stores, Inc.* (1959) 359 U.S. 207, 213, fn. 7 [3 L.Ed.2d 741, 745, 79 S.Ct. 705].) Similarly, the court noted in *Goldfarb, supra,* that it would be "unrealistic" to "automatically . . . apply to the professions antitrust concepts which originated in other areas." (421 U.S. 773, 788, fn. 17 [44 L.Ed.2d 572, 585].)

Traditional antitrust rules have been fashioned over the years in the context of private business regulation. Many of the rules are premised implicitly, sometimes explicitly, on assumptions about how rational business competitors behave in their quest for greater profit. Municipal governments, on the other hand, most often act on the basis of different motives. Unlike a private business, a municipal government's decision to displace competition is generally motivated by the purpose of furthering local health, safety or welfare. When acting in its regulatory capacity, a local government is both authorized to act in accordance with, and entrusted with the duty of serving, the public weal. Just as courts should proceed cautiously lest they might unnecessarily interfere with rights of local self-governance (Frug, *The City as a Legal Concept* (1980) 93 Harv.L.Rev. 1059; Cirace, *An Economic Analysis of the "State-Municipal Action" Antitrust Cases* (1982) 61 Tex.L.Rev. 481, 490, fn. 50, 514; 1 DeTocqueville, Democracy in America (Mayer ed., Lawrence trans. 1969) pp. 90-91 and *passim*), so too courts must be attentive and sensitive to the legitimate motives behind municipal regulations. Therefore, contrary to the urging of plaintiffs and amici, we will not mechanically apply to municipalities rules of law fashioned exclusively in the different context of private business regulation. Such standards will no doubt be helpful in formulating rules for the application of antitrust principles to municipalities, but if unbending application of traditional standards would prove too inflexible to accommodate legitimate governmental objectives that motivate municipal regulation, we will not hesitate to cautiously depart from traditional rules. (Shenefield, *The Parker* v. *Brown State Action Doctrine and the New Federalism of Antitrust* (1982) 51 Antitrust L.J. 337, 346; Note, *The Application of Antitrust Laws to Municipal Activities* (1979) 79 Colum.L.Rev. 518, 539-543; Note, *Home Rule and the Sherman Act After Boulder: Cities Between a Rock and a Hard Place* (1983) 49 Brooklyn L.Rev. 259, 291-297 [hereinafter cited *Home Rule*]; *The Supreme Court, 1981 Term* (1982) 96 Harv.L.Rev. 268, 272-276.)[13]

---

[13]See also authorities cited *post,* page 673, footnote 24.

b. The Two Traditional Standards: The Rule of Reason, and the Rule of Per Se Illegality

Although the prohibition in section 1 of "[e]very contract, combination . . . or conspiracy, in restraint of trade" was at first applied literally to invalidate *all* such restraints (e.g., *United States* v. *Trans-Missouri Freight Ass'n* (1897) 166 U.S. 290, 328 [41 L.Ed. 1007, 1023, 17 S.Ct. 540] ["the plain and ordinary meaning of . . . [section 1] is not limited to that kind of contract alone which is an unreasonable restraint of trade, but all contracts are included . . ." within the section's proscription]), the court soon retreated from this manichean view of the Act, holding it was not intended to strike down restraints merely ancillary or incidental to another legitimate purpose. (*United States* v. *Addyston Pipe & Steel Co.* (6th Cir. 1898) 85 F. 271, 282, mod. and affd. *sub nom. Addyston Pipe & Steel Co.* v. *United States* (1899) 175 U.S. 211, 244 [44 L.Ed. 136, 148-149, 20 S.Ct. 96].) In *Standard Oil Co.* v. *United States* (1911) 221 U.S. 1 [55 L.Ed. 619, 31 S.Ct. 502], the court announced that the Act "evidenced the intent not to restrain the right to make and enforce contracts . . . which did not unduly restrain interstate or foreign commerce, but to protect that commerce from being restrained by methods . . . which would constitute an interference,— that is, an undue restraint." (*Id.* at p. 60 [55 L.Ed. at p. 645]; see also *United States* v. *American Tobacco Co.* (1911) 221 U.S. 106, 179 [55 L.Ed. 663, 693-694, 31 S.Ct. 632] ["restraint of trade" covers only those acts that "injuriously restrain[] trade"].) Today, under what has become termed the "rule of reason," many restraints are analyzed in light of their economic effects on market conditions, and may be upheld if "reasonable," i.e., if the restraint "merely regulates and perhaps thereby promotes competition" instead of suppressing or destroying competition. (*Chicago Bd. of Trade* v. *United States* (1918) 246 U.S. 231, 238 [62 L.Ed. 683, 687, 38 S.Ct. 242].)

Some types of restraints, however, were never given such accommodating review. Cartels—agreements among producers to set prices above the competitive level by lowering production—were early declared illegal "per se," and the courts refused to consider arguments that prices set by a cartel were "reasonable." (Note, *Fixing the Price Fixing Confusion: A Rule of Reason Approach* (1983) 92 Yale L.J. 706, 710-712 [hereinafter *Price Fixing Confusion*].) Whereas these cases focused on cartel behavior (e.g., *United States* v. *Trenton Potteries Co.* (1927) 273 U.S. 392 [71 L.Ed. 700, 47 S.Ct. 377, 50 A.L.R. 989]; see *Price Fixing Confusion, supra*, at p. 712, fn. 38; Comment, *The Per Se Illegality of Price-Fixing—Sans Power, Purpose, or Effect* (1952) 19 U.Chi.L.Rev. 837, 855) and refused to consider economic reasonableness on the assumption that cartels were themselves evils to be eradicated (e.g., Bork, *supra,* 9 J.L. & Econ. at p. 11), the United States Supreme Court in 1940 significantly expanded the universe of price-related

agreements subject to an irrebuttable presumption of illegality. In *United States* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150 [84 L.Ed. 1129, 60 S.Ct. 811], the court, through Justice Douglas, inferred the existence of a cartel from the defendants' agreement to buy surplus oil. *Socony,* however, focused on price fixing itself rather than the inferred cartel; the court stated that whether the parties actually could or did succeed in fixing prices was irrelevant, and broadly characterized the proscribed conduct of price fixing: "Under the Sherman Act a combination formed for the purpose and with the effect of raising, depressing, fixing, pegging, or stabilizing the price of a commodity . . . is illegal *per se.* . . ." (*Id.* at p. 223 [84 L.Ed. at p. 1168].) "[T]he machinery employed . . . is immaterial." (*Ibid.*) "Any combination which tampers with price structures is engaged in an unlawful activity." (*Id.* at p. 221 [84 L.Ed. at p. 1167].)

The focus of attention since *Socony* has been on whether defendants have in any way agreed on a course of conduct affecting prices: if the label "price fixing" is found to fit the conduct in question,[14] the courts have mechanically declared such conduct illegal "even though no invidious purpose or harmful economic consequences have been established, and even though the economic results of the conduct may be of net benefit to consumers." (*Price Fixing Confusion, supra,* 92 Yale L.J. at p. 714; see *Arizona* v. *Maricopa County Medical Soc'y* (1982) 457 U.S. 332 [73 L.Ed.2d 48, 102 S.Ct. 2466] [member physicians' "foundations" to set maximum fees charged to insurance plan patients illegal per se price fixing].) The per se rule reflects an irrebuttable presumption that, if the court were to subject the conduct in question to a full-blown inquiry, a violation would be found under the traditional rule of reason. (*Id.* at p. 344 [73 L.Ed.2d at pp. 58-59]; *Northern Pac. Ry.* v. *United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549, 78 S.Ct. 514].)

Although the price-fixing illegal per se rule has its adherents, and is asserted to be economically reliable and administratively efficient,[15] it has also

---

[14]The court has at times declined to treat as illegal per se, conduct seemingly within *Socony*'s broad price-fixing definition. (E.g., *Broadcast Music, Inc.* v. *Columbia Broadcasting Sys., Inc.* (1979) 441 U.S. 1, 20 [60 L.Ed.2d 1, 16, 99 S.Ct. 1551] [blanket licenses not illegal per se even though music associations "fixed" license prices, because such licenses created a market efficiency, i.e., a product different from individually licensed compositions].) It has been suggested that "'price fixing' is no more than a label given to arrangements that have been found unlawful per se." (Easterbrook, *Maximum Price Fixing* (1981) 48 U.Chi.L.Rev. 886, 887.)

[15]E.g., Kaysen & Turner, Antitrust Policy: An Economic and Legal Analysis (1959) page 142 (rule is relatively clear, self-enforcing, and administratively efficient); Scherer, Industrial Market Structure and Economic Performance (2d ed. 1980) page 510 (abandoning the rule would lead to uncertainty, complex litigation, and undue burdens on courts and administrative agencies); Redlich, *The Burger Court and the Per Se Rule* (1979) 44 Alb.L.Rev. 1 (rule protects competitors' right to make independent judgments regarding price); Rahl,

suffered steady and growing criticism as an often arbitrary, mechanical, and inconsistently applied rule that ignores the realities of market power and net economic effects.[16] Of course, we are not here concerned with the wisdom or efficacy of the per se rule as it applies to price fixing in the typical case against private business defendants. Nevertheless, we question whether the rule should be extended to cover the municipal defendants in this case. Therefore, although plaintiffs urge us to declare the ordinance facially invalid because it represents blatant, albeit government-imposed, vertical and horizontal[17] fixing of maximum prices, we must first pause to consider whether these municipal defendants should be subject to the per se rule, the rule of reason, or a more accommodating standard.

c. Purpose and Applicability of the Per Se Rule Against Price Fixing

■ Of course, "it is . . . improper to dispose of an antitrust case by invoking a per se rule unless the challenged practice really fits the policy and rationale of the rule." (Elman, *"Petrified Opinions" and Competitive Realities* (1966) 66 Colum.L.Rev. 625, 627; cf., *Boulder, supra,* 455 U.S. 40, 65 [70 L.Ed.2d 810, 827], Rehnquist, J., dis. [questioning whether per se rules of illegality will apply to municipal defendants in the same manner as they apply to private business defendants].) Because we determine below that the two principal justifications for the rule's application to private business enterprises—economic reliability and ease of administration[18]—are not implicated in the situation before us, we must conclude that the per se rule has no place in this case.

---

*Price Competition and the Price Fixing Rule—Preface and Perspective* (1962) 57 Nw.U.L.Rev. 137 (rule provides a clear guide for business conduct and a simplified approach to resolving cases); Adams, *The "Rule of Reason": Workable Competition or Workable Monopoly?* (1954) 63 Yale L.J. 348 (criticizing attacks on the rule); Note (1983) 57 Tulane L.Rev. 994 (*Maricopa* properly reaffirmed the per se illegality of price fixing agreements).

[16]E.g., Easterbrook, *Maximum Price Fixing* (1981) 48 U.Chi.L.Rev. 886 (maximum price fixing is almost always beneficial to consumers, and hence should not be subject to per se analysis); Elman, *"Petrified Opinions" and Competitive Realities* (1966) 66 Colum.L.Rev. 625 (per se rule should not be mechanically applied to vertical maximum resale price agreements); Bork, *The Rule of Reason and the Per Se Concept: Price Fixing and Market Division pt. II* (1965) 75 Yale L.J. 373 (use of per se rules outside context of horizontal price-fixing agreements destroys efficiency and misallocates resources); von Kalinowski, *The Per Se Doctrine—An Emerging Philosophy of Antitrust Law* (1964) 11 UCLA L.Rev. 569 (cautioning against mechanical application and adoption of per se rules); Director & Levi, *Law and the Future: Trade Regulation* (1956) 51 Nw.U.L.Rev. 281 (suggesting that price fixing should not be condemned as illegal per se unless it affects the market); Jaffe & Tobriner, *The Legality of Price-Fixing Agreements* (1932) 45 Harv.L.Rev. 1164 (proposing abolition of the "arbitrary" per se rule against price fixing, in favor of the rule of reason); *Price Fixing Confusion, supra,* 92 Yale L.J. at p. 714, & *passim.*

[17]Plaintiffs assert that the ordinance creates a coercive vertical combination between the Board and individual landlords and furthermore that it creates a horizontal combination among all covered landlords.

[18]*Maricopa, supra,* 457 U.S. at pages 343-354 [73 L.Ed.2d at pages 57-65].

### (i) Economic Reliability

The per se rule is thought to be economically reliable because, the courts assume, price fixing almost always has anticompetitive effects and almost never has procompetitive effects or "redeeming virtue." Although it is unquestionable that the United States Supreme Court has long viewed price fixing by private business enterprises as illegal per se (e.g., *Monsanto Co.* v. *Spray-Rite Service Corp.* (1984) 465 U.S. 752, 761 [79 L.Ed.2d 775, 783, 104 S.Ct. 1464, 1469]), we note that the court has never addressed the question whether the same rule applies to the same conduct by municipalities. Moreover, just as the Supreme Court in the past has declined to apply the per se rule in circumstances that pose previously unaddressed questions of economic effect (cf. *White Motor Co.* v. *United States* (1963) 372 U.S. 253, 261 [9 L.Ed.2d 738, 745, 83 S.Ct. 696] [refusing to apply a new per se rule]; but see, *Maricopa, supra,* 457 U.S. 332, 349 [73 L.Ed.2d 48, 61] [applying an established per se rule to a "new" industry]), we too are reluctant to announce at this early stage, and without the benefit of any evidence regarding the economic consequences of locally imposed rent controls, that price fixing implemented by a local government necessarily produces negative net anticompetitive effects or that it lacks "any redeeming virtue." (*Continental T. V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36, 50 [53 L.Ed.2d 568, 580, 97 S.Ct. 2549]; see *post,* pp. 670-671, fn. 20.)

The court's conclusion that price fixing by private business defendants is "invariably anticompetitive," is based on a fear that even if prices are reasonable when set, by sanctioning such behavior the courts would facilitate fixing of unreasonable prices in the future. (*Socony, supra,* 310 U.S. 150, 221 [84 L.Ed. 1129, 1167]; *Trenton Potteries, supra,* 273 U.S. 392, 397 [71 L.Ed. 700, 705].) In the context of price fixing by a cartel, the *Trenton Potteries* court observed that "[t]he aim and result of every price-fixing agreement, if effective, is the elimination of one form of competition. The power to fix prices, whether reasonably exercised or not, involves power to control the market and to fix arbitrary and unreasonable prices. The reasonable price fixed today may through economic and business changes become the unreasonable price of tomorrow. Once established, it may be maintained unchanged because of the absence of competition secured by the agreement for a price reasonable when fixed." (273 U.S. 392, 397 [71 L.Ed. 700, 705].) The *Socony* court echoed this concern, noting that "[t]hose who controlled the prices would control or effectively dominate the market. And those who were in that strategic position would have it in their power to destroy or drastically impair the competitive system." (310 U.S. 150, 221 [84 L.Ed. 1129, 1167].)

The court's fear of facilitating such "predatory" activity is grounded on assumptions about how unrestrained business competitors will act if given

the opportunity. These assumptions have no place in the present case, however. There is nothing to suggest that the named defendants are acting for their own selfish purposes with a view toward securing market control and hence price control in the future. Quite the contrary, defendants' sole and only legitimate purpose is to serve the public welfare as described in section 3 of the ordinance. When that purpose no longer exists—i.e., when annual average citywide rental vacancies exceed 5 percent over a six-month period—the ordinance provides for lifting of rent controls until the vacancy rate again falls below 5 percent. (§ 6, subd. (q).) We therefore conclude that neither the presumption that price fixing is invariably anticompetitive, nor the fear of facilitating "predatory" practices—both concerns that have been expressed by the United States Supreme Court in the context of analyzing the conduct of private business defendants—justifies application of the per se rule to municipalities acting in their legitimate governmental capacities.

### (ii) Ease of Administration

The per se rule is also said to be justified by its ease of judicial administration. Both the *Trenton Potteries* and the *Socony* courts further explained refusal to inquire into the reasonableness of set prices on the ground that such a review would necessitate constant detailed supervision and analysis by the government to assure that reasonable prices remain reasonable as economic conditions vary. (273 U.S. 392, 397-398 [71 L.Ed. 700, 705-706]; 310 U.S. 150, 221 [84 L.Ed. 1129, 1167].)[19] Recently, the *Maricopa* court stated that the high costs associated with "elaborate inquiry into . . . reasonableness" was a major justification for analyzing maximum price fixing in the health care industry under the per se rule. (457 U.S. 332, 343-344 [73 L.Ed.2d 48, 57-58].)

Certainly, the judicial task is easier when the question is changed from "does the conduct unreasonably restrain competition" to "have defendants engaged in price fixing." Resort to this rule of administrative convenience, however, can be justified only if the costs "of formulating the rule, and of the overinclusiveness that inevitably accompanies it—are less than the attendant savings in administrative costs." (*Price Fixing Confusion, supra,* 92 Yale L.J. at p. 709; see also *United States* v. *Container Corp.* (1969) 393 U.S. 333, 341 [21 L.Ed.2d 526, 532, 89 S.Ct. 510] (Marshall, J., dis.); Ehrlich & Posner, *An Economic Analysis of Legal Rulemaking* (1974) 3 J. Legal Stud. 257, 264-273; Easterbrook, *Maximum Price Fixing, supra,* 48 U.Chi.L.Rev. 886, 909-910; Bohling, *A Simplified Rule of Reason for*

---

[19]Likewise, it has long been recognized that courts are poorly suited to judge the reasonableness of prices set by businesses. (*United States* v. *Trans-Missouri Freight Ass'n* (1897) 166 L.Ed. 290, 331-332 [41 L.Ed. 1007, 1024-1025, 17 S.Ct. 540].)

*Vertical Restraints: Integrating Social Goals, Economic Analysis, and Sylvania* (1979) 64 Iowa L.Rev. 461, 490-491.)

The potential for overinclusiveness in the present case is apparent. Whereas the United States Supreme Court in *Trenton Potteries* and *Socony* based its refusal to consider whether private business defendants had set reasonable prices largely on the absence of administrative supervision and on the impracticality of constant judicial review of such prices, the present case presents a different situation. By express provision of the ordinance, it is the Board's duty constantly to review and, if necessary, to adjust rents in order to assure each landlord a "fair return on his investment." On the face of the ordinance, rents would "be subject to continuous administrative supervision and readjustment in light of changed conditions" (*Socony, supra,* 310 U.S. 150, 221 [84 L.Ed. 1129, 1167]) without requiring any involvement by the courts unless a landlord chooses to exercise his right to appeal his individual adjustment. Moreover, costs of administering the program are borne by the local agency: the ordinance is designed to allow the Board efficiently to address and resolve adjustment disputes and to be financially self-supporting.

We therefore must conclude that application of the "ease of administration" justification for the per se rule would, in the present case, improperly remove from judicial scrutiny an elaborate government-enforced maximum price control and adjustment scheme not contemplated by the court's previous cases dealing with private business defendants. (See Posner, *The Proper Relationship Between State Regulation and the Federal Antitrust Laws* (1974) 49 N.Y.U. L.Rev. 693, 706.) We cannot say that probable economic harm, together with social costs resulting from absence of a per se rule, outweighs the risk of condemning, without any detailed inquiry, a local government's heretofore presumed legitimate exercise of its police powers. (Cf. Bohling, *supra,* 64 Iowa L.Rev. at p. 491.) In our view, maximum rents price fixing, implemented by local government, is simply not of the same character as price fixing among private business defendants.[20]

---

[20]Surely, the ordinance at issue here is not a naked restraint of trade with no purpose except stifling of competition. (See Note, *Crawling Out From Under Boulder* (1984) 34 Case Western Res. L.Rev. 303, 332-333.) In this regard, the dissent recognizes that per se rules are inapplicable if the challenged restraint has "any redeeming virtue" (*post,* p. 715; *Continental T. V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36, 50 [53 L.Ed.2d 568, 580, 97 S.Ct. 2549], quoting *Northern Pacific, supra,* 356 U.S. at p. 5 [2 L.Ed.2d at p. 549]), but proceeds to ignore this established test, in favor of its own subjective inquiry into whether the ordinance's anticompetitive effects "override" its redeeming virtue. This unprecedented modification of *Northern Pacific-Sylvania* renders the dissent's analysis internally contradictory: at the same time the dissent recognizes the impropriety of balancing local policy against antitrust policy (*post,* p. 717), it plunges head-on to do just that by balancing a local policy's redeeming virtue against its anticompetitive effects. (*Post,* p. 718.) Thus—through the thinly veiled guise of its revised standard of review—the dissent would engage in the same *Loch-*

Because we find neither the economic reliability justification nor the ease of administration justification applicable to municipal defendants' alleged anticompetitive behavior, we decline to subject these defendants to analysis under the per se rule.[21] We turn, instead, to the rule of reason. If this were a typical case in which it was determined that a per se rule did not apply to a claim of facial conflict with the Sherman Act, our inquiry would end here and the parties would be left to litigate their antitrust claims at trial under the rule of reason. (*Rice* v. *Norman Williams Co., supra,* 458 U.S. 654, 661 [73 L.Ed.2d 1042, 1050].) We cannot take that course in this appeal, however, because, as we conclude below, the rule of reason as presently formulated is inapplicable to review of alleged conflict between a municipal regulation and the Sherman Act.

### d. Applicability of the Rule of Reason

In *National Soc. of Professional Engineers* v. *U. S.* (1978) 435 U.S. 679 [55 L.Ed.2d 637, 98 S.Ct. 1355] the court held a professional association's price maintenance scheme illegal per se. Before reaching that conclusion, however, the court reviewed the defendant's claim that its conduct was legal under the rule of reason because it was motivated by a desire to forestall

---

*ner*-type analysis that it purports to disclaim, in order to accomplish the desired result: judicial veto of local economic regulation deemed to be unwise. (Indeed, one need look no further than the titles of the dissent's authorities to see that this is the ultimate objective.)

Furthermore, even if the dissent might somehow be read to avoid such balancing, its analysis would be plainly circular. In order to determine that the per se rule of illegality of price fixing—itself a presumption—applies here, the dissent would apparently create a foundational presumption that municipal price fixing lacks "any redeeming virtue"; in other words, according to the dissent, municipal price fixing is per se illegal because it is per se meritless. This effectively guts the *Northern Pacific-Sylvania* holdings that presence of "redeeming virtue" renders per se analysis inapplicable. Finally, the dissent's suggestion that failure to apply a per se rule would somehow violate federal policy is curious at best. The Sherman Act says nothing of per se rules. The per se rule is a procedural device created by the federal courts largely for their administrative convenience; it is not a substantive rule of law. (*Northern Pacific, supra,* 356 U.S. at p. 5 [2 L.Ed.2d at p. 549]; *Maricopa, supra,* 457 U.S. at p. 344 [73 L.Ed.2d at p. 58].) A state court violates no federal policy by declining to extend per se analysis to an unprecedented attack on municipal regulation.

[21]A third possible justification for application of per se rules, closely related to the ease of administration justification, relates to predictability. This justification, in turn, assumes clearly defined judicial pronouncements on prohibited and permissible conduct—an assumption that has no basis with respect to the novel question of potential federal antitrust conflict with a municipality's exercise of its police powers.

For yet another reason, the per se rule is not applicable in this case. The per se rule is itself dependent on the applicability of the rule of reason. (E.g., Note, *Antitrust Standing, Antitrust Inquiry, and the Per Se Standard* (1984) 93 Yale L.J. 1309, 1311.) As noted above, the per se rule reflects an irrebuttable presumption that, if the court were to subject the conduct in question to a full-blown inquiry, a violation would be found under the traditional rule of reason. If, as we conclude below, the traditional rule of reason must be modified or rejected in order to accommodate municipal defendants, it follows that traditional per se analysis cannot be applied to those defendants. (*Home Rule, supra,* 49 Brooklyn L.Rev. at pp. 294-296.)

decreased quality, and hence public harm, that might result if there was unrestrained competitive bidding among engineers. The court rejected the defendant's public welfare argument: "[c]ontrary to its name, the Rule [of Reason] does not open the field of antitrust inquiry to any argument in favor of a challenged restraint that may fall within the realm of reason. Instead, it focuses directly on the challenged restraint's impact on competitive conditions." (*Id.* at p. 688 [55 L.Ed.2d at p. 648]; *Chicago Bd. of Trade, supra,* 246 U.S. 231, 238 [62 L.Ed. 683, 687]; *Standard Oil, supra,* 221 U.S. 1, 58 [55 L.Ed. 619, 644].) The court made clear that under the rule of reason, inquiry is limited to whether the challenged conduct promotes or suppresses competition. (435 U.S. at p. 691 [55 L.Ed.2d at p. 650].) The parties will not be heard to argue, and a court may not consider, whether a policy favoring competition is in the public interest. (*Id.* at p. 692 [55 L.Ed.2d at p. 650].)

As stated above, however, we will not mechanically apply to municipal defendants rules of law developed exclusively in the context of determining private business antitrust liability. Whereas private business is motivated chiefly by the goal of increasing profits, the only legitimate purpose for municipal action is promotion of public health, safety and welfare. If courts were to judge municipal conduct under the rule of reason as it applies to private business enterprises, i.e., solely by the effect of the restraint on competition, most municipal actions would be found to violate the law: "[c]ompetition simply does not and cannot further the interests that lie behind most social welfare legislation." (*Boulder, supra,* 455 U.S. 40, 66 [70 L.Ed.2d 810, 828], Rehnquist, J., dis.) At the least, such regulations would be declared void; at worst, local governments might be subject to treble damages.[22] We cannot believe that Congress intended such results to flow from a municipality's heretofore presumed legitimate exercise of its police power.[23] (*Id.,* at p. 67 [70 L.Ed.2d at p. 829] ["If municipalities are permitted only to enact ordinances that are consistent with the procompetitive policies of the Sherman Act, a municipality's power to regulate the economy would be all but destroyed."]; Vanderstar, *supra,* 32 Cath.U.L.Rev. at pp. 397-400; Handler, *The Current Attack on the Parker v. Brown State Action Doctrine* (1976) 76 Colum.L.Rev. 1, 15; Hovenkamp, *Tying Arrangements in the Real Estate Market: Federal Antitrust Law and Local Land Development Policy* (1981) 33 Hastings L.J. 325, 335.)

---

[22]See *Boulder, supra,* 455 U.S. 40, 56, footnote 20 [70 L.Ed.2d 810, 822] ("we do not confront the issue of remedies appropriate against municipal officials") (but see Rehnquist, J., dis. at p. 65, fn. 2); *Lafayette, supra,* 435 U.S. 389, 401-402 [55 L.Ed.2d 364, 375-376] (same); Areeda, Antitrust Law (Supp. 1982) par. 212.2b; *Home Rule, supra,* 49 Brooklyn L.Rev. at pages 297-299; Comment, *Antitrust Trebel Damages as Applied to Local Government Entities: Does the Punishment Fit the Defendant?* 1980 Ariz.St.L.J. 411.

[23]See *Birkenfeld, supra,* 17 Cal.3d 129, 153-164.

To prevent unwarranted interference with a municipal government's legitimate exercise of its police power, and to accommodate the motives that underlie local government regulation (cf. e.g., Elzinga, *The Goals of Antitrust Law: Other Than Competition and Efficiency, What Else Counts?* (1977) 125 U.Pa.L.Rev. 1191), courts must develop tests that recognize a public welfare "defense" to alleged violation of the antitrust laws by municipalities. (*Boulder, supra,* 455 U.S. at pp. 66-67 [70 L.Ed.2d at pp. 828-829], Rehnquist, J., dis.; *Home Rule, supra,* 49 Brooklyn L.Rev. at pp. 294-295; Note, *The Application of Antitrust Laws to Municipal Activities* (1979) 79 Colum.L.Rev. 518, 539-543; *The Supreme Court, 1981 Term* (1982) 96 Harv.L.Rev. 62, 268, 275.)[24]

e. Facial Validity of the Ordinance Under a Modified Standard

We do not mean to suggest that rejection of the traditional rule of reason test in this case harkens return to "the same wide-ranging, essentially standardless inquiry into the reasonableness of local regulation" reminiscent of *Lochner* v. *New York* (1905) 198 U.S. 45 [49 L.Ed. 937, 25 S.Ct. 539]. (*Boulder, supra,* 455 U.S. at p. 67 [70 L.Ed.2d at p. 829], Rehnquist, J., dis.) Whereas the primary evil of the *Lochner* approach was an overly strict emphasis on the ends-means nexus that in turn allowed judges wide latitude to impose their own standards of reasonableness on economic and social legislation, such jurisprudence has no place in our analysis of a municipal regulation's potential conflict with the antitrust laws.[25]

---

[24]See also McMahon, *supra,* 14 Toledo L.Rev. at pages 544-545; James, *Municipal Defenses to Antitrust Liability* (1983) 6 U.Ark. Little Rock L.J. 273, 290-296; Klitzke, *Antitrust Liability of Municipal Corporations: The Per Se Rule vs. The Rule of Reason—A Reasonable Compromise* 1980 Ariz. St. L.J. 253, 265-273; Freilich et al., *Antitrust Liability and Preemption of Authority: Trends and Developments in Urban, State and Local Government Law* (1983) 15 Urban Law. 705, 711-713; Brame & Feller, *The Immunity of Local Governments and Their Officials From Antitrust Claims After City of Boulder* (1982) 16 U. Rich. L.Rev. 705, 715-717; Comment, *Community Communications Co. v. City of Boulder: Denial of Parker Exemption to Home Rule Cities* 1983 Utah L.Rev. 139, 159-160; Comment, *Affiliated Capital Corp. v. City of Houston: Local Governments and Antitrust Immunity* (1983) 35 Baylor L.Rev. 791, 816-818; cf. Levin, *The Antitrust Challenge to Local Government Protection of the Central Business District* (1983) 55 U.Colo.L.Rev. 21, 64-79; Note, *Post Lafayette Municipal Liability for Refusing to Zone Outlying Development* (1981) 59 Wash.U.L.Q. 485, 509-510; Chu, *Antitrust Liability for Municipal Airport Operations: Will It Fly?* (1983) 49 J. Air L. & Commerce 245, 280-282; Marticorena, *Municipal Cable Television Regulation: Is There Life After Boulder?* (1982) 9 Western St.U. L.Rev. 113, 166-167.

[25]For the same reason we decline to analyze municipal conduct under a so-called "municipal rule of reason." (See, e.g., James, *supra,* 6 U.Ark. Little Rock L.J. at pp. 291-296 [proposing such an approach]; Comment, *supra,* 35 Baylor L.Rev. at pp. 816-818 [same].) Whereas the rule of reason as presently formulated focuses solely on the policy of promoting competition (*Professional Engineers, supra*), recognition of a municipal public policy "defense" within the framework of the rule of reason would drastically alter the nature of a court's rule of reason inquiry: a court would apparently be called on to balance the "amount" of anticompetitive restraint against a municipality's interest in effectuating a de-

In articulating an appropriate test by which to review municipal actions alleged to conflict with the federal antitrust laws, we seek on the one hand a test that is sufficiently flexible to accommodate the interest of local government in promoting public health, safety and welfare programs or regulations. At the same time, we favor a standard that is not toothless; mere incantation of a purpose to promote the public welfare should not insulate municipal regulations from invalidation under the supremacy clause. Local governments should not be judged under a standard that will guarantee validity even for improperly motivated or implemented[26] anticompetitive municipal regulations or commercial enterprises that plainly undermine the objectives of the federal antitrust laws.

We turn for initial guidance to the United States Supreme Court's commerce clause cases. ■ State or local regulation will be upheld against commerce clause attack if the regulation (1) does not discriminate against interstate commerce and (2) bears a rational relationship to a legitimate local purpose. In addition, the extent to which the court will permit burdens on interstate commerce depends on (3) the nature of the local interest, and whether it could be promoted with a lesser impact on interstate activities. Once these elements are satisfied, the court applies a balancing test: a regulation will be upheld unless its incidental burdens on interstate commerce are clearly excessive in relation to the putative local benefits. (E.g., *Edgar* v. *MITE Corp.* (1982) 457 U.S. 624, 643-646 [73 L.Ed.2d 269, 283-285, 102 S.Ct. 2629] [striking down state business takeover act]; *Kassel* v. *Consolidated Freightways Corp.* (1981) 450 U.S. 662, 671-679 [67 L.Ed.2d 580, 587-592, 101 S.Ct. 1309] [striking down state truck length statute]; *Minnesota* v. *Clover Leaf Creamery Co.* (1981) 449 U.S. 456, 471-474 [66 L.Ed.2d 659, 673-675, 101 S.Ct. 715] [upholding state law banning plastic and nonreturnable milk containers]; *Hughes* v. *Oklahoma* (1979) 441 U.S. 322, 336-338 [60 L.Ed.2d 250, 261-263, 99 S.Ct. 1727] [striking down state regulation of minnow trade]; *Pike* v. *Bruce Church, Inc.* (1970) 397

sired local purpose. If the rule of reason were so modified, it would be no more than a means for judges to impose their own policy judgments on municipal actions. (See *Boulder, supra,* 455 U.S. at pp. 67-68 [70 L.Ed.2d at pp. 829-830], Rehnquist, J., dis.; Civiletti, *The Fallout from Community Communications Co. v. City of Boulder: Prospects for a Legislative Solution* (1983) 32 Cath.U.L.Rev. 379, 386-387; Comment, *Alternative Approaches to Municipal Antitrust Liability* (1982) 11 Fordham Urban L.J. 51, 81-82; cf. Marticorena, *supra,* 9 Western St.U.L.Rev. at pp. 166-167.) We therefore reject a modified rule of reason; instead, we adopt a test that prevents judicial second-guessing of local decisions to accomplish proper local purposes. (See *post,* pp. 675-676, fn. 28.)

[26]Certainly, official misconduct or conflict of interest should not be immune from condemnation under the antitrust laws. See Note, *supra,* 79 Colum.L.Rev. at page 538; compare, Cirace, *supra,* 61 Tex.L.Rev. at page 498 (arguing that municipalities should be exempt from antitrust scrutiny if (a) displacement of competition is no broader than the scope of the substantial market failure, imperfection, or instability at which it is directed, and (b) implementation involves no official misconduct, discrimination, or conflict of interest).

U.S. 137, 142 [25 L.Ed.2d 174, 178, 90 S.Ct. 844] [striking down state law on packaging of cantalopes]; *Dean Milk Co.* v. *Madison* (1951) 340 U.S. 349, 353-356 [95 L.Ed. 329, 332-334, 71 S.Ct. 295] [striking down local milk regulation].)

With appropriate modifications, we believe that a test modeled after the court's commerce clause cases will provide a workable standard for judging alleged conflict between municipal ordinances and the federal antitrust laws. We will, however, depart from the United States Supreme Court's commerce clause test in one significant respect. We will not apply the wide-ranging, essentially standardless cost-benefit analysis employed in the court's recent "balancing" decisions. (See, e.g., *MITE Corp., supra,* 457 U.S. 624 [73 L.Ed.2d 269]; *Kassel, supra,* 450 U.S. 662 [67 L.Ed.2d 580]; *Clover Leaf Creamery, supra,* 449 U.S. 456 [66 L.Ed.2d 659]; see generally, Eule, *Laying the Dormant Commerce Clause to Rest* (1982) 91 Yale L.J. 425 [criticizing the court's balancing approach, and proposing an alternate standard]; Maltz, *How Much Regulation is too Much—An Examination of Commerce Clause Jurisprudence* (1981) 50 Geo.Wash.L.Rev. 47 [same]; Tushnet, *Rethinking the Dormant Commerce Clause* 1979 Wis.L.Rev. 125 [same].) Balancing a municipality's need for particular local health, safety and welfare regulations or programs against often incommensurable alleged anticompetitive effects is a task for which courts are not well suited. On the other hand, a standard applicable to municipalities must be capable of considering those economic efficiency factors that underlie federal antitrust policy.

Adapting the court's commerce clause test to this facial section 1 attack on a municipal rent control ordinance, we conclude that if a municipal regulation has a proper local purpose, is rationally related to the municipality's legitimate exercise of its police power,[27] and operates in an even handed manner, it must be upheld against a claim that it conflicts with section 1 of the Sherman Act unless the plaintiff demonstrates that the city's purposes could be achieved as effectively by means that would have a less intrusive impact on federal antitrust policies.[28]

---

[27]This formulation would not rest determination of permissible anticompetitive municipal conduct on findings that the local government engaged in "traditional," or "integral" functions, nor would an ordinance's validity turn on the distinction between "governmental" as opposed to "proprietary" activities. Framing permissible conduct in terms of a municipality's exercise of its legitimate police powers, on the other hand, encompasses all local actions rationally related to promotion of local health, safety and welfare. (*Home Rule, supra,* 49 Brooklyn L.Rev. at p. 294, fn. 191.)

[28]We recognize that this standard calls on courts to make difficult determinations as to whether proposed alternative means of accomplishing a legitimate local purpose would do so (1) as effectively as the challenged means and (2) through means that intrude less on the policies of the federal antitrust laws. Regardless of the difficulty of these determinations,

■ Applying this test to the present case, we first observe that our decision in *Birkenfeld* forecloses any suggestion that the regulation is not supported by a legitimate purpose. There are no allegations of conflict of interest or illegal collusion in the enactment or drafting of the ordinance. ■ Moreover, "[i]t has long been settled that [municipal police] power extends to objectives in furtherance of the public peace, safety, morals, health and welfare and 'is not a circumscribed prerogative, but is elastic and, in keeping with the growth of knowledge and the belief in the popular mind of the need for its application, capable of expansion to meet existing conditions of modern life.'" (17 Cal.3d 129, 160.)

■ Nor can it be suggested at this late date that rent control is not rationally related to the municipality's legitimate exercise of its police power. We observed in *Birkenfeld* that, as in the present case, "[t]he charter amendment includes in its stated purposes for imposing rent control the alleviation of the ill effects of the exploitation of a housing shortage by the charging of exorbitant rents to the detriment of the public health and welfare of the city and particularly its underprivileged groups. [Citation.] The amendment thus states on its face the existence of conditions in the city under which residential rent controls are reasonably related to promotion of the public health and welfare and are therefore within the police power." (*Ibid.*) Furthermore, *Birkenfeld* very clearly establishes that, even absent a so-called "housing emergency," local regulation of rents for the purposes stated in section 3 of the present ordinance is a rational exercise of the municipality's police power. (*Id.* at pp. 153-164; *Carson Mobilehome Park Owners' Assn.* v. *City of Carson* (1983) 35 Cal.3d 184, 189, fn. 4 [197 Cal.Rptr. 284, 672 P.2d 1297].)

Neither can plaintiffs demonstrate that the regulation fails to operate in an even handed manner. The only possible theory of discriminatory treatment of similarly situated landlords concerns section 5, subdivision (f), of the ordinance. When the regulation was passed, this provision exempted "[r]ental units in a residential property which is divided into a maximum of four (4) units where one of such units is occupied by the landlord as his/her principal residence,"[29] but limited the exemption to "rental units that

---

however, this standard is preferable to a so-called "municipal rule of reason," because it would not require a court to balance competing—and often incommensurable—policies. (See *ante,* pp. 673-674, fn. 25.) Instead, the standard we embrace today prevents judicial second-guessing of legitimate local purposes. However, although a court may not invalidate local legislation by balancing the propriety of (or need for) a legitimate local purpose against federal antitrust policies, a court may invalidate a municipality's means of achieving a local policy if the local goal is sought to be advanced through discriminatory or irrational means, or if it could be achieved as effectively by means that can be demonstrated to likely intrude less on federal antitrust policies.

[29]This subdivision was amended in 1982 to limit the exemption to rental property divided into two units. See *ante,* page 654, footnote 2.

would have been exempt under the provisions of this Ordinance had this Ordinance been in effect on December 31, 1979." Plaintiffs do not challenge the exemption itself; instead, they challenge subdivision (f), to the extent that it excludes from the exemption any property that became owner-occupied after December 31, 1979.

As defendants point out, however, the challenged exclusion from the exemption bears a debatable rational relationship to the purposes of the ordinance. The Berkeley electorate could reasonably have determined that the exclusion was desirable to prevent some landlords from avoiding application of the ordinance by evicting tenants and moving into their rental property after the provisions of the proposed ordinance became known. (See Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade* (1983) 35 Rutgers L.Rev. 723, 758 & fn. 128 [suggesting that in jurisdictions without the exemption limitation, such abuse is widespread].)[30] Because the disparate treatment afforded similarly situated landlords is supported by a debatable rational basis, this aspect of plaintiffs' challenge must also be rejected. (*Clover Leaf Creamery, supra,* 449 U.S. 456, 464 [66 L.Ed.2d 659, 668]; *New Orleans* v. *Dukes* (1976) 427 U.S. 297, 303 [49 L.Ed.2d 511, 516, 96 S.Ct. 2513]; *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 395 [149 Cal.Rptr. 375, 584 P.2d 512].)

Finally, plaintiffs suggest no alternative, equally effective approach to achieving defendants' legitimate local purposes by means that would have a less intrusive impact on federal antitrust policies. Indeed, such a showing could be made only after extensive evidence has been taken in the trial court. We therefore hold that plaintiffs have failed to establish that the ordinance on its face conflicts with section 1 of the Sherman Act.

## C. Facial Validity of the Ordinance Under Section 2 of the Sherman Act

Plaintiffs also assert that the ordinance on its face violates section 2 of the Act. That section provides inter alia that "[e]very person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . shall be deemed guilty of a felony . . . ." (15 U.S.C. § 2.)

In the context of reviewing the legality of private business conduct, the United States Supreme Court has established that the "offense" of mono-

---

[30]Although plaintiffs argue that any landlords so disposed would already have taken such measures because rental property of four or fewer units was already exempt from rent control by the terms of a prior ordinance (the Temporary Rent Stabilization Ordinance, passed by the Berkeley City Council eff. Dec. 30, 1979), this response ignores the fact that the ordinance now in question is far more comprehensive than its recent predecessor.

polization consists of two elements: (1) possession of "monopoly power" in the relevant market, and (2) willful acquisition of that power. (*United States* v. *Grinnell Corp.* (1966) 384 U.S. 563, 570-571 [16 L.Ed.2d 778, 785-786, 86 S.Ct. 1698].) "Monopoly power" has been defined as the "power to control prices or exclude competition." (*United States* v. *du Pont Co.* (1956) 351 U.S. 377, 391 & fn. 18 [100 L.Ed. 1264, 1278-1279, 76 S.Ct. 994].) The existence of such power may be inferred from a defendant's predominant share of the relevant market. (*Grinnell, supra,* 384 U.S. at p. 571 [16 L.Ed.2d at p. 786] [87 percent of market is monopoly power]; *American Tobacco Co.* v. *United States* (1946) 328 U.S. 781, 797 [90 L.Ed. 1575, 1587, 66 S.Ct. 1125] [two-thirds to 80 percent of market is monopoly power].) Seizing on these principles, plaintiffs claim the ordinance is "obviously" invalid because it represents a willful acquisition of power to control prices of all covered rental units in Berkeley—23,000 of the 27,000 units in that city.

Although plaintiffs' claim would likely have merit if defendants were private business parties and if the restraint was proved to affect interstate commerce, for reasons discussed above we will not mechanically apply to municipal defendants, rules of law fashioned exclusively in the context of private business regulation. Instead, and assuming, over defendants' vehement protestations, that section 2 of the Act applies to a party that is not itself a competitor in the relevant market that it is accused of monopolizing, we apply the test articulated *ante,* at page 675.

As explained previously, the stated objectives of the ordinance indicate a legitimate local purpose. Plaintiffs do not contend that the ordinance was implemented through misconduct, conflict of interest, or in order to affect discrimination—all factors that would tend to rebut defendants' claim of a legitimate purpose. (See Cirace, *supra,* 61 Tex.L.Rev. at p. 498.) It is established that the means invoked by defendants' ordinance is a rational exercise of the municipality's police power. Plaintiffs have cited no evidence tending to show that the ordinance fails to regulate similarly situated competitors in a reasonably evenhanded manner. Finally, they suggest no equally effective alternative to accomplish these legitimate local purposes by means that would have a less intrusive impact on federal antitrust policies. We therefore conclude that plaintiffs have failed to establish that the ordinance on its face conflicts with section 2 of the Sherman Act.

Because we determine that plaintiffs have not established a conflict with the Act, we do not address whether the ordinance may be exempt from antitrust scrutiny under *Boulder.* (*Rice* v. *Norman Williams Co., supra,* 458 U.S. at p. 662, fn. 9 [73 L.Ed.2d at p. 1042].) We proceed to analyze plaintiffs' additional constitutional and statutory contentions.

II. Rent Control Issues[31]

*A. Facial Validity of the Ordinance's "Fair Return" Standard*

 The primary dispute in the trial court and one of the primary substantive questions posed on this appeal concerns whether a rent control ordinance is facially constitutional if it provides that a landlord is to receive a fair return on his investment rather than a fair return on the value of his property.[32] The parties, assisted by amici curiae on both sides of the issue, have vigorously briefed and argued their respective views. We must stress at the outset, however, the limited scope of our inquiry in facial challenges such as this. As we made clear in *Birkenfeld,* whether rental regulations are fair or confiscatory depends ultimately on the result reached. (17 Cal.3d 129, 165.) That determination, of course, can only be made by analyzing a challenge to the regulation as applied. Nevertheless, we will declare a regulation invalid on its face "when its terms will not permit those who administer it to avoid confiscatory results in its application to the complaining parties." (*Id.* at p. 165; see also *Cotati Alliance for Better Housing* v. *City of Cotati* (1983) 148 Cal.App.3d 280, 287, 291 [195 Cal.Rptr. 825]; *Hutton Park Gardens* v. *Town Council* (1975) 68 N.J. 543 [350 A.2d 1, 14-16].)

For more than a decade, rent control agencies throughout this state and the nation have employed a veritable smorgasbord of administrative stan-

---

[31]As a preliminary matter, we reject plaintiffs' procedural claim that it was improper for the court to grant judgment on the pleadings because this denied them the opportunity to present evidence as to their claims of confiscation, denial of equal protection, and unlawful restraint on alienation. On a defense motion for judgment on the pleadings, all facts alleged in the complaint are deemed admitted. (*Sullivan* v. *County of Los Angeles* (1974) 12 Cal.3d 710, 714, fn. 3 [117 Cal.Rptr. 241, 527 P.2d 865]; *Colberg, Inc.* v. *State of California* ex rel. *Dept. Pub. Wks.* (1967) 67 Cal.2d 408, 411-412 [62 Cal.Rptr. 401].) There was no need for plaintiffs to present any evidence. Further, although they claim that judgment on the pleadings denied them a declaration as to facial invalidity, the judgment expressly declared the ordinance "valid on its face." It is well established that a motion for judgment on the pleadings "may be used in an action for declaratory relief to obtain a *declaratory judgment on the merits in favor of the defendant* rather than a dismissal of the plaintiff's suit." (4 Witkin, Cal. Procedure (2d ed. 1971) Proceedings Without Trial, § 161, p. 2817, italics in original.) Finally, although plaintiffs claim they should have been granted leave to amend their complaint, any amendment to make further factual allegations would only be applicable to the claim that the ordinance was invalid *as applied.* They were granted leave to amend as to this claim, but later dismissed the amended complaint.

[32]In reality, defendants' ordinance employs two administrative standards for setting maximum rents. As discussed *post* at pages 687-689, section 11 provides for annual rent adjustment, but precludes the Board from granting such citywide rent adjustment except to offset certain increases in general costs. This is, in essence, a variation on the so-called "maintenance of net operating income," or "cost passthrough" approach. (See Baar, *supra,* 35 Rutgers L.Rev. at pp. 809-816.) Section 12, subdivision (c), on the other hand, provides for individual rent increases based on "all relevant factors, including (but not limited to): . . . . (8) the landlord's rate of return on investment," as well as the landlord's costs.

dards by which to determine rent ceilings. (*Carson, supra,* 35 Cal.3d 184, 188 ["just, fair and reasonable"]; *Cotati Alliance, supra,* 148 Cal.App.3d at p. 286 ["fair and reasonable return on investment"]; *Palos Verdes Shores Mobile Estates, Ltd.* v. *City of Los Angeles* (1983) 142 Cal.App.3d 362, 371 [190 Cal.Rptr. 866] ["just and reasonable return" based on the "maintenance of profit" approach]; *Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72, 86 [191 Cal.Rptr. 47] [interpreting "return on investment" as requiring a "just and reasonable return on the fair market value of [landlords'] property"]; see also Baar, *Guidelines for Drafting Rent Control Laws: Lessons of a Decade* (1983) 35 Rutgers L.Rev. 723, 781-817 [describing and analyzing the following standards: (1) cash flow/return on gross rent; (2) return on equity (investment); (3) return on value; (4) percentage net operating income; and (5) maintenance of net operating income]; Comment, *Rethinking Rent Control: An Analysis of "Fair Return"* (1981) 12 Rutgers L.J. 617, 640-648 [hereinafter cited *Fair Return*]; Comment, *Rent Control and Landlords' Property Rights: The Reasonable Return Doctrine Revived* (1980) 33 Rutgers L.Rev. 165 [hereinafter cited *Reasonable Return Doctrine*].) As we recently stressed in *Carson,* "[r]ent control agencies are not obliged by either the state or federal Constitution to fix rents by application of any particular method or formula." (35 Cal.3d at p. 191, citing *Power Comm'n* v. *Pipeline Co.* (1942) 315 U.S. 575, 586 [86 L.Ed. 1037, 1049-1050, 62 S.Ct. 736]; *Power Comm'n* v. *Hope Gas Co.* (1944) 320 U.S. 591, 601-602 [88 L.Ed. 333, 344, 64 S.Ct. 281].)

 In view of this oft-quoted and oft-followed principle, we are not persuaded by plaintiffs' and amici's apparent contention that the much criticized return on value standard[33]—or any of its varia-

---

[33]Whereas the return on investment standard determines "just and reasonable return" by focusing on the landlord's investment, the return on value standard determines fair return by focusing on the market value of the landlord's property. The fair return on market value standard advocated by plaintiffs and amici was used by the United States Supreme Court in an early railroad rate case, *Smyth* v. *Ames* (1898) 169 U.S. 466 [42 L.Ed. 819, 18 S.Ct. 418], decree mod., 171 U.S. 361 [43 L.Ed. 197, 18 S.Ct. 888], in which the court held that railroads were entitled to rates sufficient, after deducting reasonable operating expenses, to produce a fair return on the fair market value of their assets. (169 U.S. at p. 547 [42 L.Ed. at p. 849].) The Supreme Court later changed its position, and approved use of an approach designed to ensure a fair return on investment. (*Hope Gas, supra,* 320 U.S. at pp. 599-605 [88 L.Ed. at pp. 343-346]; see Siegel, *Understanding the Lochner Era: Lessons From the Controversy Over Railroad and Utility Rate Regulation* (1984) 70 Va.L.Rev. 187, 215-259.) Rejecting the idea that rates set by the Federal Power Commission must be based on the present "fair value" of property, the *Hope Gas* court observed: "[t]he heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated." (*Id.* at p. 601 [88 L.Ed. at p. 344].) Implicit in this statement is the suggestion that a return on fair value standard is circular and unworkable. "Value" is the current worth of future benefits that may be derived from an investment. The "value" of a utility company, for example, depends in part on the rates that the utility company may charge for its product. Thus, to set rates by reference to the company's "value" is a circular process. (Siegel, *supra,* 70 Va.L.Rev.

tions[34]—is required to be employed by the Board in the present case. We reiterate that selection of an administrative standard by which to set rent ceilings is a task for local governments—in this case the voters themselves— and not the courts. Our only concern in this appeal is whether defendants' fair return on investment standard, on its face, will not permit those who administer it to avoid confiscatory results.[35] (*Birkenfeld, supra,* 17 Cal.3d

at p. 246 & fn. 253.)

The same circularity problem exists when fair market value concepts are applied in the rent control context. (See *Helmsley* v. *Borough of Fort Lee* (1978) 78 N.J. 200 [394 A.2d 65, 71-72]; Baar, *supra,* 35 Rutgers L.Rev. at pp. 798-803; *Reasonable Return Doctrine, supra,* 33 Rutgers L.Rev.) "Value is an expression of a building's potential capacity to generate rental income and incidental or intangible benefits of ownership during its useful life." (*Fair Return, supra,* 12 Rutgers L.J. at p. 640.) The current "value" of a rental property thus depends in large part on the amount of rental income the property is expected to generate. As in the utility rate cases, the process of using value to determine what rental income shall be permitted becomes circular. (Accord, *Cotati Alliance, supra,* 148 Cal.App.3d 280, 287-289; *Palos Verdes Estates, supra,* 142 Cal.App.3d 362, 370-371.) The *Cotati Alliance* court thus rejected a landlord's claim that a return on value standard is mandated for an ordinance to be facially constitutional: "The fatal flaw in the return on value standard is that income property most commonly is valued through capitalization of its income. Thus, the process of making individual rent adjustments on the basis of a return on value standard is meaningless because it is inevitably circular: value is determined by rental income, the amount of which is in turn set according to value. Use of a return on value standard would thoroughly undermine rent control, since the use of uncontrolled income potential to determine value would result in the same rents as those which would be charged in the absence of regulation. Value (and hence rents) would increase in a never-ending spiral." (148 Cal.App.3d at p. 287; accord, *Helmsley, supra,* 394 A.2d at pp. 71-72; *Niles* v. *Boston Rent Control Administrator* (1978) 6 Mass.App.135 [374 N.E.2d 296, 300-303].)

[34]Amicus for plaintiffs suggests adoption of the "public utility investment standard," which, it is urged, would result in a base rent commensurate with the value of the regulated property at the time rent controls were imposed. (Cf. *Southern Cal. Gas Co.* v. *Public Utilities Com.* (1979) 23 Cal.3d 470, 474 [153 Cal.Rptr. 10, 591 P.2d 34].) Aside from the questionable propriety of applying public utility law to the very different area of local regulation of private economic transactions, it has been observed that "if there was a housing shortage which caused rents to be artifically high, use of prerent control value as the measure [for calculating fair return] will perpetuate artifically inflated rents. Rent control utilizing this standard is no rent control at all." (*Cotati Alliance, supra,* 148 Cal.App.3d 280, 287.)

[35]As is apparently conceded by both parties, it would be premature and problematic for us to attempt to articulate, in the context of this facial attack, the constitutional test against which specific applications of various administrative standards are to be judged. We will face that question when we review a challenge to rent control as applied to particular plaintiffs. It is sufficient in this case to measure defendants' fair return on investment standard against the general proposition that an administrative standard must be such that it will permit those who administer it to avoid confiscatory results.

On a similar point, we also wish to dispel suggestions based on dictum in *Birkenfeld* that we have previously established, as a constitutional test, a requirement that rent controls must provide landlords a "just and reasonable return on their property." (17 Cal.3d at p. 165.) This statement was made in the context of a broader discussion of the legitimate exercise of local police power, and was most certainly not intended to articulate a constitutional standard. *Birkenfeld*'s reference to the term "property" should therefore be viewed with caution; it would be inappropriate to suggest that the *Birkenfeld* statement can be used to predict the specific constitutional standard that we will articulate when we review a challenge to rent control as applied.

at p. 165; *Power Comm'n* v. *Pipeline Co., supra,* 315 U.S. at pp. 585-586 [86 L.Ed. at pp. 1049-1050]; *Hutton Park, supra,* 350 A.2d at pp. 13-16.) If we conclude that the fair return on investment standard affords the Board sufficient flexibility to avoid confiscatory results, we must uphold the ordinance. (*Cotati Alliance, supra,* 148 Cal.App.3d at pp. 289-291.)

Plaintiffs and amici posit a number of due process obstacles and practical difficulties that the Board may face in administering the return on investment standard, but none will prevent the Board from avoiding confiscatory results.

1. Adjustment of Landlords' Frozen May 1980 Profit Amount, and Consideration of the Effect of Inflation

One of plaintiffs' primary complaints is that section 11 of the ordinance locks landlords into the fixed dollar amount of profit they earned in May 1980,[36] and that in order for the Board to avoid confining those landlords who invested long ago with preinflation dollars to their May 1980 profit amount, it must be free under section 12 of the ordinance to take into consideration the effect of inflation on individual landlords' investments[37] and award fair returns based on "adjusted" investment figures.[38]

---

[36]Plaintiffs demonstrate this point by the following hypothetical: In May of 1980, a landlord's gross rental income is $10,000; his operating expenses total $9,000, as follows: mortgage payment of $6,000; property taxes of $1,000; utility bills of $2,000. Thus his net return (profit) is $1,000. In May of 1982 his expenses remain the same except that utility costs increase by $500 to $1,500, thereby reducing his net return to $500. Under these circumstances the section 11 annual general adjustment mechanism allows the Board to provide for a 5 percent increase in rent, to $10,500, so that the landlord's profit amount would be the same number of dollars ($1,000) as it was two years earlier. However, no relief is or can be provided under section 11 for the erosionary effect of two years of inflation on the $1,000 base income, the purchasing power of which has been diminished.

[37]The "effect of inflation" issue was apparently raised for the first time at oral argument in the Court of Appeal. On July 21, 1983, the appellate court vacated submission of the case in order to receive defendants' written concession of July 5, 1983, that the term "fair return on investment" in section 12, subdivisions (c) and (i), may reasonably be interpreted to permit the Board to consider and allow for any decrease in the purchasing power of the landlord's return caused by inflation. Both the court's order and defendants' letter, as well as plaintiffs' response thereto, are part of the record before us on appeal. The issue has been briefed and responses have been filed.

[38]Plaintiffs' point can best be explained by a hypothetical example. Assuming that the Board were to fix a "fair return on investment" at 10 percent for all landlords, the following might occur: Recent investor A has invested $70,000 since 1979, and he earned a profit of $6,000 in 1980. In 1984 he petitions the Board under section 12 for an increase in his return on investment. Under its 10 percent return on investment standard, the Board may grant A an increase of $1,000, so that his 1984 amount of profit is $7,000. Additional contributions to capital could, of course, also yield a 10 percent return.

In contrast, long-term investor B has invested $40,000 since 1950, and he, too, earned a profit of $6,000 in 1980. However, when in 1984 he petitions the Board under section 12 for an increase in his return on investment, he will be turned down if the Board mechanically multiplies his $40,000 investment by a 10 percent return. Hence, B would be limited to his

Clearly, if the fixed amount of a landlord's profit remains the same year after year his return will in time diminish in real value: it is obvious that a $1,000 "profit" in 1990 will have a much lower value than the same dollar amount of profit in 1980. Furthermore, although a fixed profit amount may produce a reasonable or fair return on investment for low-risk investments such as bonds, we must agree with plaintiffs that investment in rental units contemplates a higher risk and hence, in times of high inflation and when viewed in the long term, demands more than mere maintenance of an existing profit amount. (*Cotati Alliance, supra,* 148 Cal.App.3d at p. 295; *Hutton Park Gardens* v. *Town Council, supra,* 350 A.2d 1, 15 [a just and reasonable return on investment is one that is generally commensurate with returns on investments in other enterprises having comparable risks].) Therefore, although defendants' ordinance may properly *restrict* landlords' profits on their rental investments, it may not indefinitely *freeze* the dollar amount of those profits without eventually causing confiscatory results. (*Cotati Alliance, supra,* at p. 293 ["If the net operating profit of a landlord continues to be the identical number of dollars, there is in time a real diminution to the landlord which eventually becomes confiscatory."].)

In determining the facial validity of the ordinance against plaintiffs' claim that it must be interpreted to require the Board to account for the effect of inflation on investment in determining a landlord's amount of profit or return, we adhere to the rule earlier stressed, that whether a regulation produces a return that is confiscatory or fair depends ultimately on the result, and that we will invalidate an ordinance on its face only if its terms preclude avoidance of confiscatory results.

First, it is not apparent that the ordinance on its face precludes alternative means of adjusting landlords' frozen May 1980 profit amounts.[39] Moreover, even assuming arguendo that a confiscatory result might occur in a future individual case if the Board fails to invoke measures necessary to adjust the dollar amount of a landlord's May 1980 profit, this would still provide us no basis on which to invalidate the entire ordinance, or its administrative "fair return on investment" standard. Unlike *Birkenfeld,* in which we de-

---

frozen May 1980 amount of return—$6,000. Only if (as plaintiffs suggest is mandatory) the Board takes into account the effect of inflation on his investment, and "adjusts" his investment figure accordingly, or if (as § 12, subd. (c)(8), seems to allow (see *post,* p. 683, fn. 39)) the Board assigns him a higher rate of return, may he secure an increase in the amount of profit he received in 1980.

[39]For example, nothing in the ordinance precludes the Board from adjusting the rate (percentage) of return on investment in order to increase a landlord's amount of profit. Indeed, the ordinance seems to contemplate ad hoc adjustment of individual landlord's rates of return in order to reach this result: section 12, subdivision (c)(8), provides that in making individual adjustments the Board shall consider "[t]he landlord's *rate* of return on investment." (Italics added.) See section 12, subdivision (c), set out *post,* page 689, footnote 46.

termined that inherent and unnecessary procedural defects inevitably deprived all landlords of due process "except perhaps for a lucky few" (17 Cal.3d at p. 172), in this case, by contrast, it is unknown what percentage of landlords might be able to prove unconstitutional confiscation if the Board fails to consider the effect of inflation on dollars invested in order to adjust a landlord's frozen profit amount. Nor do we have before us any evidence to suggest that when faced with such a prospect, the Board will decline to invoke measures within its powers to adjust individual profit amounts. ▮ In this regard we observe that "[i]t is to be presumed that the board will exercise its powers in conformity with the requirements of the Constitution; and if it does act unfairly, the fault lies with the board and not the statute." (*Butterworth* v. *Boyd* (1938) 12 Cal.2d 140, 149 [82 P.2d 434, 126 A.L.R. 838].) ▮ Until we are required to review a specific challenge to the Board's application of the ordinance, we note simply that, as defendants themselves concede (*ante,* p. 682, fn. 37), the ordinance is not drawn so narrowly as to preclude consideration of the effect of inflation on a landlord's investment in those cases in which the Board might deem it necessary to take that factor into account in order to avoid causing a confiscatory result.[40]

## 2. Irrational Discrimination

Plaintiffs also argue that the investment standard denies equal protection because it will result in different rent ceilings for comparably valued rental units. This issue was raised and properly decided in *Cotati Alliance,* in which the court observed that such disparate treatment bears a debatable rational relationship to a legitimate public purpose: the voters could have reasonably concluded that the investment standard, more effectively than a value-based standard, ensures noninflated, reasonable rents for citizens in times of high inflation. (*Cotati Alliance, supra,* 148 Cal.App.3d 280, 292; see *Hale* v. *Morgan* (1978) 22 Cal.3d 388, 395 [149 Cal.Rptr. 375, 584 P.2d 512].)

---

[40]Nothing in the ordinance requires the Board to fix a landlord's return based only on his "actual" investment. Further, although section 12, subdivision (c), contains a list of "relevant factors" to be considered by the Board in determining the appropriate amount of a landlord's rents, these factors are expressly nonexclusive. And perhaps most significant, subsection (8) of subdivision (c), permits the Board to consider "all relevant factors" in determining the "landlord's rate of return on investment." See section 12, subdivision (c), set out *post* at page 689, footnote 46.

We read *Cotati Alliance* to be consistent with our determination today. That case merely suggests that a rent board "*may*" consider the effect of inflation if doing so is necessary to assure a landlord a fair return, and hence avoid a confiscatory result, in a specific case. (148 Cal.App.3d at p. 289.)

### 3. Ascertaining the Extent of a Landlord's "Investment"

Plaintiffs next predict problems applying the investment standard to landlords who, for various reasons, have made little or no cash investment. However, those who purchased with no down payment, improved property years ago with "preinflation dollars," or who obtained property through gift or inheritance, need not be deprived of a fair return simply because they made no initial monetary investment. The ordinance does not confine "investment" to such a restrictive definition. The Board, therefore, is not precluded, in appropriate cases, from considering as "investment," a landlord's personal labor in improving his property. (*Cotati Alliance, supra,* 148 Cal.App.3d at pp. 287, 289.) Nor is the Board precluded from imputing the transferor's "investment," adjusted as might be necessary, to landlords who obtained property by gift or inheritance. (*Ibid.*; *Fair Return, supra,* 12 Rutgers L.J. at p. 645.) Furthermore, the ordinance does not preclude the Board from considering "forms of investment such as mortgage payments toward principal, [or] cash invested in later improvements in the property" (*Cotati Alliance,* 148 Cal.App.3d at p. 287), or, with certain exceptions,[41] the terms of a landlord's individual financing obligations. In fact, the ordinance directly provides for such flexible application of the investment standard. Subdivision (i) of section 12 provides that "[n]o provision of this Ordinance shall be applied so as to prohibit the Board from granting an individual rent adjustment that is demonstrated necessary by the landlord to provide the landlord with a fair return on investment."

### 4. Deprivation of Full Long-term Appreciation

Finally, amicus for plaintiffs appears to argue that the ordinance's investment standard is unconstitutional on its face because it unfairly deprives landlords of full long-term appreciation on the value of their regulated property. The thrust of this contention is apparently aimed at establishing that, as a matter of due process, rent control ordinances must guarantee all landlords a fair return on the full market value of their property. This issue was also raised in *Cotati Alliance,* in which the court observed that "[s]ome lessening of appreciation is a necessary consequence of any rent control, since future appreciation is to a significant extent a function of increased rental income. [Citation.] It is one of the very sources of long-term appreciation—inflated rents—that rent control measures are intended to restrict." (148 Cal.App.3d at p. 290.)[42]

---

[41]See section 12, subdivisions (d) and (e), set out *post,* page 692, footnote 53.

[42]The court further noted: "[l]andlords also argue that the ordinance unfairly denies long-time landlords any appreciation from the time of acquisition to the date when rents were first controlled, but the ordinance did not *reduce* rents when it was enacted, and thus, did not affect preordinance appreciation." (*Id.* at pp. 290-291 (italics in original).)

The fallacy of plaintiffs' contention is readily apparent. Any price-setting regulation, like most other police power regulations of property rights, has the inevitable effect of reducing the value of regulated properties. But it has long been held that such reduction in property value does not by itself render a regulation unconstitutional. ■ Police power legislation results in a confiscatory "taking" only when the owner has been deprived of substantially all reasonable use of the property. (*Agins* v. *City of Tiburon* (1979) 24 Cal.3d 266, 277 [157 Cal.Rptr. 372, 598 P.2d 25], affd. (1980) 447 U.S. 255 [65 L.Ed.2d 106, 100 S.Ct. 2138].) Even a significant diminution in value is insufficient to establish a confiscatory taking. (*Euclid* v. *Ambler Realty Co.* (1926) 272 U.S. 365 [71 L.Ed. 303, 47 S.Ct. 114, 54 A.L.R. 1016] [75 percent reduction in value because of zoning law insufficient to establish a taking]; *Hadacheck* v. *Sebastian* (1915) 239 U.S. 394 [60 L.Ed. 348, 36 S.Ct. 143] [nearly 90 percent reduction in value because of use restriction insufficient to establish a taking].) As the United States Supreme Court noted in *Hope Gas Co., supra,* 320 U.S. at page 601 [88 L.Ed. at page 344], "[t]he fixing of prices, like other applications of the police power, may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid." (Accord, *Penn. Central Transp. Co.* v. *New York City* (1978) 438 U.S. 104, 131 [57 L.Ed.2d 631, 652, 98 S.Ct. 2646] [diminution in property value, standing alone, cannot establish a "taking"]; *Permian Basin Area Rate Cases* (1968) 390 U.S. 747, 769 [20 L.Ed.2d 312, 337, 88 S.Ct. 1344] ["No constitutional objection arises from the imposition of maximum prices merely because . . . the value of regulated property is reduced as a consequence of regulation."].)

■ Thus, although we need not articulate in this facial attack the precise constitutional standard that all administrative rent control standards must meet (*ante,* p. 681, fn. 35), we can state with certainty that a rent control ordinance need not provide for a fair return on the value of a landlord's property in order to survive a facial challenge. We conclude that defendants' fair return on investment standard will not preclude the Board from avoiding confiscatory results, and hence the administrative standard established in the ordinance is constitutionally valid on its face. (Cal. Const., art. I, § 7; accord, *Oceanside Mobilehome Park Owners' Assn.* v. *City of Oceanside* (1984) 157 Cal.App.3d 887, 897-900 [204 Cal.Rptr. 239]; *Cotati Alliance, supra,* 148 Cal.App.3d at pp. 288-289, and cases and authorities cited.)[43]

---

[43]To the extent it is contrary to this determination, *Gregory* v. *City of San Juan Capistrano* (1983) 142 Cal.App.3d 72, 85-86 [191 Cal.Rptr. 47] is disapproved.

## B. Facial Validity of the Ordinance's Rent Adjustment Procedures

 As we observed recently in *Carson,* "[when] rent ceilings of an indefinite duration are established, a mechanism must be provided for granting those increases necessary to permit landlords a just and reasonable return. 'The mechanism is sufficient for the required purpose only if it is capable of providing adjustments in maximum rents without a substantially greater incidence and degree of delay than is practically necessary.'" (35 Cal.3d at p. 191, quoting *Birkenfeld, supra,* 17 Cal.3d at p. 169.) As plaintiffs observe, "[p]roperty may be as effectively taken by long-continued and unreasonable delay in putting an end to confiscatory rates as by an express affirmance of them . . . ." (*Smith* v. *Illinois Bell Tel. Co.* (1926) 270 U.S. 587, 591 [70 L.Ed. 747, 749, 46 S.Ct. 408].)

Of course, some delays are inherent in any rent control scheme. But, "only those delays which are longer than practically necessary to achieve the legitimate purposes of the legislation are constitutionally proscribed." (*Carson, supra,* 35 Cal.3d at p. 192; *Birkenfeld, supra,* 17 Cal.3d at pp. 169, 173.)

 The test used to review the facial validity of defendants' adjustment procedures is the same one used above to review the ordinances' administrative standard for individual maximum rent adjustments under section 12. We will declare the adjustment procedures invalid only if the ordinance on its face will not permit the Board to avoid confiscatory results. Although in *Birkenfeld* we found Berkeley's former ordinance facially unconstitutional on this basis because, by its terms, it precluded reasonably prompt action in most cases, the ordinance before us now contains none of the problems found in the former regulation.

The prior ordinance had no provision for "general rental adjustments for all or any class of rental units based on generally applicable factors such as property taxes." (*Birkenfeld,* 17 Cal.3d at p. 171.) Although we recently recognized in *Carson* that a rent control ordinance need not have a general adjustment provision to pass constitutional muster (35 Cal.3d at p. 194), such a mechanism will be required when the "magnitude of the job to be done" (*Birkenfeld,* at p. 169) so demands. Since we decided *Birkenfeld* the number of rental units in Berkeley subject to rent control has increased to 23,000. However, the exact mechanism found wanting in 1976 is present in the ordinance before us now in section 11[44]—a comprehensive scheme

---

[44]Section 11, as amended in 1982 (see *ante,* p. 654, fn. 2), provides in full (deletions are stricken with a horizontal line; additions are in italics):

"a. Once each year, the Board shall consider setting and adjusting the rent ceiling for all rental units covered by this Ordinance in general and/or particular categories of rental units

that provides for annual[45] across the board adjustment based on "cost" factors.

The adjustment for all landlords under section 11 is designed to allow landlords to retain the generally same dollar amount of profit in subsequent years that they received in May 1980. In order to acquire rent increases that

---

covered by this Ordinance deemed appropriate by the Board. The Board shall hold at least two public hearings prior to making any annual general adjustment of the rent ceilings. The first such public hearing shall be conducted no later than October 31, 1980, and the first annual general adjustment shall be made no later than December 31, 1980. *The Board shall publish and publicize notices of the date, time, and place of the public hearings at least thirty (30) days prior to the hearing date. The two required public hearings shall be conducted and the annual general adjustment shall be set between September 1 and October 31, of each year. The annual adjustment shall become effective the following January 1.*

"b. In making annual general adjustments of the rent ceiling, the Board shall:

"(1) Adjust the rent ceiling upward by granting those landlords who pay for utilities a utility adjustment for increases in the City of Berkeley for utilities.

"(2) Adjust the rent ceiling upward by granting landlords a property tax, maintenance and operating expense increase adjustment (exclusive of utilities) for increases in the City of Berkeley for property taxes and maintenance and operating expenses.

"(3) Adjust the rent ceiling downward by requiring landlords to decrease rents for any decreases in the City of Berkeley for property taxes.

"*(4) Adjust the rent ceiling downward by requiring landlords who pay for utilities to decrease rents for any decreases in the City of Berkeley for utilities.*

"In adjusting rents *ceilings* under this subsection, the Board shall adopt a formula or formulas of general application. This formula will be based upon a survey or *the annual rent registration forms, surveys, information and testimonies presented at public hearings, and* other available data indicating increases or decreases in the expenses *relating to the rental housing market* in the City of Berkeley set forth in this subsection. For maintenance and operating expense adjustments, the Board may also use survey data from surrounding communities where appropriate. The Board shall make no more than one annual adjustment of rent ceilings per year.

"*Adoption of a formula greater than forty-five percent (45%) of the increase in the Consumer Price Index for the twelve months ending the previous June 30 shall require the affirmative vote of six (6) Commissioners, other provisions notwithstanding. Adoption of such a formula shall be a specific and special exception to the requirement of only five (5) affirmative votes to make a decision. For the purposes of this subsection, the Consumer Price Index shall mean the Consumer Price Index for all urban consumers in San Francisco—Oakland, all items (1967 equals 100), as reported by the Bureau of Labor Statistics of the U.S. Department of Labor, as it pertains to the City of Berkeley.*

"c. An upward general adjustment in rent ceilings does not automatically provide for a rent increase. Allowable rent increases pursuant to a general upward adjustment shall become effective only after the landlord gives the tenant at least a thirty (30) days written notice of such rent increase and the notice period expires.

"d. If the Board makes a downward general adjustment in the rent ceilings, landlords of rental units to which this adjustment applies shall give tenants of such rental units written notice of the rent decrease to which they are entitled. Such rent decreases shall take effect not later than thirty (30) days after the effective date set by the Board for the downward general adjustment. (Fn. 44 continued on next page.)

---

[45]We are informed by amicus that general adjustments under section 11 in the past four years have been as follows: 1981, 5 percent (6.21 if the landlord provided space heating); 1982, 9 percent; 1983, 5 percent; 1984, no increase (apparently because of the low inflation rate for 1983). See Baar, *supra,* 35 Rutgers L.Rev. at pages 779-780.

reflect cost increases not imposed on other landlords generally, or in order to seek an increase in dollar amount of return (i.e., the dollar amount of profit), a landlord must secure an individual adjustment pursuant to section 12, subdivision c.[46] And, as observed *ante* at pages 682-684, unless land-

"e. If the maximum allowable rent specified under this Ordinance for a rental unit is greater than the rent specified for such unit in the rental agreement, the lower rent specified in the rental agreement shall be the maximum allowable rent until the rental agreement expires. If the maximum allowable rent specified under this Ordinance for a rental unit is less than the rent specified for such unit in the rental agreement, the lower rent specified under this Ordinance shall be the maximum allowable rent.

"f. No rent increase pursuant to an upward general adjustment of a rent ceiling shall be effective if the landlord:

"(1) Has continued to fail to comply, after order of the Board, with any provisions of this Ordinance and/or orders or regulations issued thereunder, or

"(2) Has failed to bring the rental unit into compliance with the implied warranty of habitability, *or*

"*(3) Has failed to make repairs as ordered by the Housing Inspection Services of the City of Berkeley, or*

"*(4) Has failed to completely register by September 1, except as provided in Subsection 11.g. below.*

"g. *The amount of an upward general adjustment for which a landlord shall be eligible shall decrease by ten (10) percent per month for each month beyond December 1 for which the landlord fails to register.*

"h. *A landlord who is ineligible to raise rents under an upward general adjustment for an entire calendar year shall not be eligible to raise rents under that particular general adjustment in future years.*"

[46]Section 12, subdivision c, provides in full: "In making individual adjustments of the rent ceiling, the Board or the hearing examiner shall consider the purposes of this Ordinance and shall specifically consider all relevant factors, including (but not limited to):

"(1) Increases or decreases in property taxes;

"(2) Unavoidable increases or any decreases in maintenance and operating expenses;

"(3) The cost of planned or completed capital improvements to the rental unit (as distinguished from ordinary repair, replacement and maintenance) where such capital improvements are necessary to bring the property into compliance or maintain compliance with applicable local code requirements affecting health and safety, and where such capital improvement costs are properly amortized over the life of the improvement;

"(4) Increases or decreases in the number of tenants occupying the rental unit, living space, furniture, furnishings, equipment, or other housing services provided, or occupancy rules;

"(5) Substantial deterioration of the controlled rental unit other than as a result of normal wear and tear;

"(6) Failure on the part of the landlord to provide adequate housing services, or to comply substantially with applicable state rental housing laws, local housing, health and safety codes, or the rental agreement;

"(7) The pattern of recent rent increases or decreases;

"(8) The landlord's rate of return on investment. In determining such return, all relevant factors, including but not limited to the following shall be considered: the landlord's actual cash down payment, method of financing the property, and any federal or state tax benefits accruing to landlord as a result of ownership of the property;

"(9) Whether or not the property was acquired or is held as a long-term or short-term investment; and

"(10) Whether or not the landlord has received rent in violation of the terms of this Ordinance or has otherwise failed to comply with the Ordinance.

"It is the intent of this Ordinance that individual upward adjustments in the rent ceilings on units be made only when the landlord demonstrates that such adjustments are necessary to provide the landlord with a fair return on investment."

lords have reasonable access to such individual adjustments, the ordinance has the potential for producing unconstitutional results.

In comparison to the procedures for individual adjustment in Berkeley's former regulation—which, we said, "put the Board in a procedural strait jacket" (*Birkenfeld, supra,* 17 Cal.3d at p. 171)—the ordinance before us now is solicitous of due process. The initiative drafters apparently studied *Birkenfeld,* and took it to heart: every major procedural failing that we noted in the former ordinance has been addressed, and additional procedural protections not previously mentioned have been included.

The previous Berkeley ordinance found invalid in *Birkenfeld* (1) did not allow a landlord to file a petition for rent adjustment unless it was accompanied by a certificate of building code compliance from the city's building code department; (2) gave the Board no power to consolidate petitions for units in the same building, unless the tenants consented; and (3) gave the Board (five members each paid a maximum of $2,400 per year) no power to delegate the holding of hearings to hearing officers, or even to members or panels of the Board. (17 Cal.3d at pp. 170-171.) As defendants point out, none of these "defects" appear in the new ordinance: (1) there is no requirement that a landlord's petition be accompanied by a certificate from the building department, or from anyone else;[47] (2) the Board is expressly given the power to consolidate a landlord's petitions for units in the same building—whether or not the tenants consent;[48] and (3) the ordinance expressly gives the Board the power to appoint hearing officers to hold hearings,[49] and the hearing officers are authorized to issue decisions that are

---

[47]Section 12, subdivision a provides in full: "Petitions. Upon receipt of a petition by a landlord and/or tenant, the rent ceiling of individual controlled rental units may be adjusted upward or downward in accordance with the procedures set forth elsewhere in this Section. The petition shall be on the form provided by the Board. The Board may set a reasonable per unit fee based upon the expenses of processing the petition to be paid by the petitioner at the time of filing. No petition shall be filed before September 1, 1980. Notwithstanding any other provision of this Section, the Board or hearing examiner may refuse to hold a hearing and/or grant an individual rent ceiling adjustment for a rental unit if an individual hearing has been held and decision made with regard to the rent ceiling for such unit within the previous six months."

[48]Section 12, subdivision b(9) provides in full: "Consolidation. All landlord petitions pertaining to tenants in the same building shall be consolidated for hearing, and all petitions filed by tenants occupying the same building shall be consolidated for hearing unless there is a showing of good cause not to consolidate such petitions."

[49]Section 12, subdivision b(1) provides in full: "Hearing Examiner. A hearing examiner appointed by the Board shall conduct a hearing to act upon the petition for individual adjustments of rent ceilings and shall have the power to administer oaths and affirmations."

final unless appealed to the Board.[50] Additionally, the new ordinance imposes a time limit of 120 days on all decisions on landlord petitions.[51]

Defendants' new ordinance clearly avoids the confiscatory delays inherent in the former regulation's unit-by-unit procedure. It provides for general citywide increases to cover common costs, and its individual adjustment procedures are designed to assure reasonably prompt consideration of landlords' claims.[52] These procedures are reasonably related to achievement of the ordinance's stated purpose of, inter alia, preventing excessive rents. By its own terms, the ordinance will permit the Board to avoid confiscatory results; we therefore conclude that the ordinance, on its face, guarantees plaintiffs due process. (Cal. Const., art. I, § 7; *Birkenfeld, supra,* 17 Cal.3d at pp. 165, 173.)

## C. *Unreasonable Restraint on Alienation*

At the same time that mechanical application of the fair return on investment standard may have the potential to produce confiscatory results in some individual cases (*ante,* pp. 682-684) it is also recognized that the standard has the potential for awarding windfall returns to recent investors whose purchase prices and interest rates are high. If this latter aspect were unregulated, use of the investment standard might defeat the purpose of rent

---

[50]Section 12, subdivision b(11) provides in full: "Finality of Decision. The decision of the hearing examiner shall be the final decision of the Board in the event of no appeal to the Board. The decision of the hearing examiner shall not be stayed pending appeal; however, in the event that the Board or panel reverses or modifies the decision of the hearing examiner, the Board shall order the appropriate party to make retroactive payments to restore the parties to the position they would have occupied had the hearing examiner's decision been the same as that of the Board's."

[51]Section 12, subdivision b(12) provides in full: "Time for Decision. The rules and regulations adopted by the Board shall provide for final Board action on any individual rent adjustment petition within one hundred and twenty (120) days following the date of filing of the individual rent ceiling adjustment petition, unless the conduct of the petitioner or other good cause is responsible for the delay." As defendants point out, it is clear that the 120-day rule also applies to petition determinations that are appealed to the Board.

[52]Like the 105-day provision that we recently reviewed in *Carson,* we do not believe that the time allowed for review under section 12 is excessive. Within the 120-day time limit, "the Board must (1) review all information provided by the applicants, including complex financial and tax data, (2) review comments received from tenants, and (3) hold a hearing at which the interested parties are permitted to testify. [¶] Careful review of the information provided to the Board is important. The financial and tax data submitted by the applicant reveals whether the owner's profits have increased or decreased, whether the property taxes or operating costs associated with the [property] have increased or decreased, and whether any capital improvements have been made. Review of the information supplied by the tenants helps the Board determine whether there has been any increase or decrease in the services provided by the [landlord]." (35 Cal.3d at pp. 193-194.)

We stress that only the facial validity of the ordinance is currently before the court. Whether individual landlords might prove a denial of due process because of delays exceeding the 120-day time limit is a question of great concern, but it is not before us at this time.

price regulation. To prevent this result, defendants' ordinance, like others in the state (see Baar, *supra,* 35 Rutgers L.Rev. at p. 788, fn. 249), contains two "antispeculation" clauses that prohibit the Board from considering certain increases in mortgage interest payments when those increases occur after adoption of the ordinance. (*Id.* at pp. 788, 792.) Thus, except when refinancing is necessary to make capital improvements or in cases of individual hardship to buyers, section 12, subdivisions d and e,[53] preclude the Board from authorizing an individual rent increase because of increased interest or other expenses resulting from sale or refinancing of rental property, if the landlord could reasonably have foreseen that such increased expenses could not be covered by the "existing" rent schedule.

■ Plaintiffs do not challenge the constitutional reasonableness of the classification created by these restrictions; instead, they claim these provisions constitute unreasonable restraints on alienation in that they will inhibit sales of rental property at a fair market value in violation of Civil Code section 711. That section states simply, "[c]onditions restraining alienation, when repugnant to the interest created, are void." Plaintiffs' contention, however, ignores ordinance section 12, subdivision i, which cautions, "[n]o provision of this Ordinance shall be applied so as to prohibit the Board from granting an individual rent adjustment that is demonstrated necessary by the landlord to provide the landlord with a fair return on investment." This safety valve overrides all other provisions of the ordinance and averts any danger that subdivisions d and e might prevent a purchaser from realizing a fair return, and thus prevents any unreasonable restraint on alienation. (See generally *Wellenkamp* v. *Bank of America* (1978) 21 Cal.3d 943, 948 [148 Cal.Rptr. 379, 582 P.2d 970].)

Furthermore, even if the two subdivisions were assumed to create an unreasonable restraint, we are persuaded by defendants' contention that Civ-

---

[53]These subdivisions provide in full: "d. No individual upward adjustment of a rent ceiling shall be authorized by the Board by reason of increased interest or other expenses resulting from the landlord's refinancing the rental unit if, at the time the landlord refinanced, the landlord could reasonably have foreseen that such increased expenses could not be covered by the rent schedule then in existence, except where such refinancing is necessary for the landlord to make capital improvements which meet the criteria set forth in Section 12.c.(3). This paragraph shall only apply to that portion of the increased expenses resulting from the refinancing that were reasonably foreseeable at the time of the refinancing of the rental unit and shall only apply to rental units refinanced after the date of adoption of this Ordinance. [¶] e. Except for cases of individual hardship as set forth in Subsection 12.i. of this Ordinance, no individual upward adjustment of a rent ceiling shall be authorized by the Board because of the landlord's increased interest or other expenses resulting from the sale of the property, if at the time the landlord acquired the property, the landlord could have reasonably foreseen that such increased expenses would not be covered by the rent schedule then in effect. This Subsection (12.e.) shall only apply to rental units acquired after the date of adoption of this Ordinance."

il Code section 711 does not, and was never intended to, apply to municipal ordinances. Our review of that statute and the many cases that apply it reveals that it addresses only private restraints on alienation, and not government regulations. (Cf. 3 Witkin, Summary of Cal. Law (8th ed. 1973) Real Property, § 314, p. 2024 [the rule against restraints on alienation "is directed against the provisions in contracts or conveyances. It has no application to disabling restraints established by express statute."]; Rest., Property, pp. 2377, 2381.) None of the cases cited by plaintiffs or amici supports a contrary view.

## D. Retaliatory Eviction Presumption

Typically, rent control schemes include eviction controls that require "good cause" in order for a landlord to bring an eviction action. Without such controls, "the security of tenure objectives of rent control laws could be undermined and the threat of eviction could be used to nullify the operation of rent regulations." (Baar, *supra,* 35 Rutgers L.Rev. at p. 833.)

Accordingly, section 14 of the ordinance[54] restates this court's established holding that a landlord's retaliation against a tenant for the tenant's assertion or exercise of rights is a defense to eviction. (*Schweiger* v. *Superior Court* (1970) 3 Cal.3d 507, 517 [90 Cal.Rptr. 729, 476 P.2d 97].) The section then provides that, in an action by the landlord to recover possession or in an affirmative action taken by the tenant for damages, "evidence of the assertion or exercise by the tenant of rights under this Ordinance within six months prior to the alleged act of retaliation shall create a presumption that the landlord's act was retaliatory." As originally enacted, the section provided that " '[p]resumption' means that the Court must find the existence of the fact presumed unless and until evidence is introduced which would support a finding of its nonexistence." After the trial court's judgment in this case the latter sentence was amended in 1982 (see *ante,* p. 654, fn. 2) to

---

[54]As amended in 1982 (see *ante,* p. 654, fn. 2), the section provides (deletions are stricken with a horizontal line; additions are in italics): "No landlord may threaten to bring, or bring, an action to recover possession, cause the tenant to quit the unit involuntarily, *serve any notice to quit or notice of termination of tenancy,* decrease any services or increase the rent where the landlord's intent is retaliation against the tenant for the tenant's assertion or exercise of rights under this Ordinance. Such retaliation shall be a defense to an action to recover possession, or it may serve as the basis for an affirmative action by the tenant for actual and punitive damages and injunctive relief. In an action by or against a tenant, evidence of the assertion or exercise by the tenant of rights under this Ordinance within six months prior to the alleged act of retaliation shall create a presumption that the landlord's act was retaliatory. 'Presumption' means that the Court must find the existence of the fact presumed unless and until ~~evidence is introduced which would support a finding of its nonexistence~~ *its nonexistence is proven by a preponderance of the evidence.* A tenant may assert retaliation affirmatively or as a defense to the landlord's action without the aid of the presumption *regardless of the period of time which has elapsed between the tenant's assertion or exercise of rights under this Ordinance and the alleged act of retaliation.*"

read, " '[p]resumption' means that the Court must find the existence of the fact presumed unless and until its nonexistence is proven by a preponderance of the evidence."

Questions regarding the legality of the preamendment presumption are clearly moot. Nevertheless, it would be imprudent to avoid analysis of plaintiffs' challenges to the amended language at this time. Clearly, those parts of section 14 that were simply reenacted by the amendment are properly before us now. (*Carter* v. *Stevens* (1930) 208 Cal. 649, 651 [284 P. 217].) The question regarding the effect of the amendment is purely one of law (*Carman* v. *Alvord* (1982) 31 Cal.3d 318, 324 [182 Cal.Rptr. 506, 644 P.2d 192]); moreover, the question arises in a facial attack on appeal from an order denying an injunction, and therefore is properly resolved by this court at this time. (*Complete Service Bureau* v. *San Diego Med. Soc.* (1954) 43 Cal.2d 201, 207 [272 P.2d 497]; *Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492, 496-497 [254 P.2d 497].)

1. Classification of the Presumption

Plaintiffs claim that section 14 purports to create a presumption affecting the burden of proof, and that such presumptions created by municipal ordinance are preempted by state law. (Evid. Code, § 500.) Defendants apparently respond that section 14 creates merely a presumption affecting the burden of producing or going forward with evidence, and that, even if it does create a presumption affecting the burden of proof, section 500 and other relevant sections of the Evidence Code allow such a presumption.

a. Presumption Affecting the Burden of Producing Evidence

The burden of producing evidence refers to a party's obligation to introduce evidence sufficient to establish a prima facie case, or, in other words, sufficient to avoid nonsuit. (Evid. Code, § 110.) "A presumption affecting the burden of producing evidence is a presumption established to implement no public policy other than to facilitate the determination of the particular action in which the presumption is applied." (Evid. Code, § 603.) The code makes clear that the purpose of such a rebuttable presumption relates solely to judicial efficiency, and does not rest on any public policy extrinsic to the action in which it is invoked. A presumption affecting the burden of producing evidence is based on an underlying logical inference that the presumed fact very likely follows from the proved fact; the presumption is designed to avoid unnecessary proof of facts likely to be true if not disputed. Especially relevant to the present case, such a rebuttable presumption is designed to place the responsibility for establishing the nonexistence of certain facts on the party most able to do so. As observed in the California

Law Revision Commission's comment on section 603, "[t]he presumptions described in [that section] are not expressions of policy; they are expressions of experience. They are intended solely to eliminate the need for the trier of fact to reason from the proven or established fact to the presumed fact and to forestall argument over the existence of the presumed fact when there is no evidence tending to prove the nonexistence of the presumed fact."

If the presumption established in section 14 affects the burden of producing evidence, a tenant who shows an assertion or exercise of rights under the ordinance within six months of an eviction proceeding will have established either (1) a prima facie defense to eviction (and will hence avoid nonsuit), or (2) a prima facie case for damages, unless the landlord rebuts the presumption by evidence supporting its nonexistence by a preponderance of the evidence. (Evid. Code, §§ 110, 604.) As noted in the Assembly Committee on the Judiciary's comment on section 604, "[s]uch a presumption is merely a preliminary assumption in the absence of contrary evidence."

b. Presumption Affecting the Burden of Proof

The burden of proof, on the other hand, refers to a party's obligation to establish by evidence a requisite degree of belief concerning a fact in the mind of the trier of fact. (Evid. Code, § 115.) Unlike presumptions affecting the burden of producing evidence, which exist merely to expedite resolution of disputes, "[a] presumption affecting the burden of proof is a presumption established to implement some public policy other than to facilitate the determination of the particular action in which the presumption is applied, such as the policy in favor of establishment of a parent and child relationship, the validity of marriage, the stability of titles to property . . . ." (Evid. Code, § 605.) The purpose of such a rebuttable presumption relates to public policy goals "other than or in addition to the policy of facilitating the trial of actions." (Cal. Law Revision Com. com. on Evid. Code, § 605.) As the California Law Revision Commission observes, "[f]requently, presumptions affecting the burden of proof are designed to facilitate determination of the action in which they are applied. Superficially, therefore, such presumptions may appear merely to be presumptions affecting the burden of producing evidence. What makes a presumption one affecting the burden of proof is the fact that there is always some further reason of policy for the establishment of the presumption. It is the existence of this further basis in policy that distinguishes a presumption affecting the burden of proof from a presumption affecting the burden of producing evidence." (*Ibid.*)

If a presumption affecting the burden of proof is established by section 14, a tenant who shows an assertion or exercise of rights under the ordi-

nance within six months of the eviction proceeding will effectively shift to the landlord the burden of disproving the tenant's defense or case for damages, by requiring the landlord to prove to the trier of fact, by a preponderance of the evidence, that eviction was not retaliatory. (Evid. Code, §§ 115, 606.) In other words, unlike presumptions affecting the burden of producing evidence, which would merely protect a tenant against nonsuit, a presumption affecting the burden of proof would shift the ultimate responsibility of persuasion to the landlord.

c. Presumption Created by the Amendment

Defendants concede that it is difficult to classify the presumption created by section 14. Plaintiffs implicitly recognize the same problem: although they characterized the amended presumption in earlier briefs as a valid presumption affecting the burden of producing evidence, in recent briefs they claim it is an invalid presumption affecting the burden of proof.

Viewing the section's language in the context of the entire ordinance, and in light of the earlier preamendment version, we must agree with plaintiffs that the amended section 14 presumption affects the burden of proof. Regarding the latter point first, we note that the preamendment language paralleled Evidence Code section 604's description of the effect of a presumption affecting the burden of producing evidence: former section 14 specified that "the Court must find the existence of the fact presumed unless and until evidence is introduced which would support a finding of its nonexistence." Evidence Code section 604 similarly provides that a presumption affecting the burden of producing evidence "require[s] the trier of fact to assume the existence of the presumed fact unless and until evidence is introduced which would support a finding of its nonexistence."

It thus seems reasonably clear that the former section established a presumption affecting the burden of producing evidence. It would also be reasonable to assume that the amendment was intended to change, rather than simply restate or clarify, the original presumption. First, the amendment specifically omitted reference to introduction of evidence that would support a finding of the presumed fact's nonexistence—and therefore it departs from the express language of Evidence Code section 604. Moreover, to the extent the amendment was intended to clarify and restate the previous presumption that affected only the burden of producing evidence, the new section would quite obviously be a failure—because its language describes that kind of presumption even less clearly than did its predecessor.

The suggestion that the amendment was intended to implement a presumption affecting the burden of proof, and not merely one affecting the

burden of producing evidence, is further supported by defendants' own description of the purpose of the amended presumption. Defendants claim the presumption is intended to further the municipality's policy against retaliatory evictions and to promote the policy of encouraging tenants to exercise their rights under the ordinance. In view of the previous section's subsequent amendment—and because, as defendants admit, section 14 is designed to further policies extrinsic to, or in addition to, the policy of facilitating determination of particular eviction actions—we must conclude that the amended section creates a presumption affecting the burden of proof.

2. Direct Preemption by the Evidence Code

Although municipalities have power to enact ordinances creating substantive defenses to eviction (*Birkenfeld, supra,* 17 Cal.3d 129, 149), such legislation is invalid to the extent it conflicts with general state law. (*Id.* at p. 152; Cal. Const., art. XI, § 7.) Plaintiffs claim that section 14, as amended, directly conflicts with Evidence Code section 500, which states: "Except as otherwise provided by law, a party has the burden of proof as to each fact the existence or nonexistence of which is essential to the claim for relief or defense that he is asserting." They note that under section 14, proof of retaliation is "essential" to establishing the tenant's defense or claim for relief; therefore, they argue, Evidence Code section 500, requires that the tenant prove the fact of retaliation.

Defendants respond that Evidence Code section 500 by its own terms does not apply to situations "otherwise provided [for] by law." Plaintiffs, in turn, maintain that this exception does not contemplate local ordinances or charter amendments.

The term "law," as used in Evidence Code section 500, is defined as including "constitutional, statutory, and decisional law." (Evid. Code, § 160.) Defendants contend that section 160 was not intended to exclude local ordinances as a source of "law," but was merely intended to make clear that the term "law" includes judicial decisions. (See Cal. Law Revision Com. com. to § 160.) They therefore invite us to construe "statutory" as including ordinances.

Indeed, there have been cases in which courts have suggested that the term "statute" embraces local ordinances. (*City of Los Angeles* v. *Belridge Oil Co.* (1954) 42 Cal.2d 823, 833-834 [271 P.2d 5]; *King Mfg. Co.* v. *Augusta* (1928) 277 U.S. 100, 102-114 [72 L.Ed. 801, 804-810, 48 S.Ct. 489].) Neither of those cases, however, assists defendants. In *Belridge* we observed that a city licensing ordinance could be construed as a statute under the statute of limitations; in *King* the United States Supreme Court

construed an ordinance as a statute for the purpose of satisfying jurisdiction. But, in neither case did the court address issues remotely approaching the question posed here: whether a local ordinance can be deemed a "statute" for purposes of deviating from the established rules of evidence relating to burden of proof.

The answer to this question would seem so settled that, like other firm rules of law, few courts have recently had occasion to address the issue. Long before enactment of Evidence Code sections 500 and 160, we suggested that municipal governments have no authority to depart from the common law of evidence. (*Orena* v. *City of Santa Barbara* (1891) 91 Cal. 621, 629 [28 P. 268] [an "ordinance is void . . . [to the extent that it purports to] lay down rules of evidence . . . ."].) Similarly, commentators have maintained that, "[w]ithout express authority the general rules of evidence or procedure may not be changed by ordinance by a municipal corporation" (9 McQuillin, Municipal Corporations (3d ed. 1978) § 27.45, p. 670; see also 2 Dillon, Municipal Corporations (5th ed. 1911) § 643, p. 983), and that, "[u]nlike the legislature, the governing body of a municipal corporation has no power to prescribe rules of evidence for the guidance of courts. Therefore, a municipal ordinance . . . concerning the burden of proof [is void]." (31 Cal.Jur.3d, Evidence, § 5, at p. 37.) See also *Cohen* v. *St. Louis Merchants' Bridge Terminal Ry.* (1916) 193 Mo.App. 69 [181 S.W. 1080, 1081-1082] (" 'the city cannot by ordinance in any wise change or alter the ordinary rules of evidence applicable in this court' "); *Fitch* v. *Pinckard* (1842) 4 Scam. 69, 78 (5 Ill. 72, 81) ("[T]he [municipal] corporation exceeded its powers, in declaring that the collector's deed should be evidence of a compliance with all the prerequisites of the ordinance. The legislature alone possesses the power to make, change, or alter the rules of evidence."); cf., *The City Council* v. *Dunn* (S.C. 1821) 1 McCord 333 (in absence of statutory provision to the contrary, an ordinance may not depart from the common law rules of evidence).

Given this background, we cannot believe that the Legislature, when it enacted Evidence Code sections 500 and 160 in 1965, ever intended municipal ordinances to come within the exception clause of Evidence Code section 500. Whether the Evidence Code directly or by implication preempts a local ordinance that purports to create a presumption shifting the burden of producing evidence is a separate issue, on which we reserve decision. (See Evid. Code, § 550, subd. (b).) For now, we conclude that the Legislature deliberately excluded ordinances from those sources of law that may change the traditional allocation of the burden of proof, and that the presumption in section 14 shifting the burden of proof, on its face, directly conflicts with the Evidence Code. (§ 500.) To that extent, the ordinance is invalid.

*E. Due Process and Preemption Challenges to the Ordinance's Rent Withholding Provisions*

Section 15[55] sets out remedies for landlords' violations of the ordinance—e.g., failure to register pursuant to section 8,[56] or charging of rents above

---

[55]This section provides in full: "a. For Violation of Rent Ceilings or Failure to Register. If a landlord fails to register in accordance with Section 8 of this Ordinance, or if a landlord demands, accepts, receives or retains any payment in excess of the maximum allowable rent permitted by this Ordinance, a tenant may take any or all of the following actions until compliance is achieved:

"(1) A tenant may petition the Board for appropriate relief. If the Board, after the landlord has proper notice and after a hearing, determines that a landlord has wilfully and knowingly failed to register a rental unit covered by this Ordinance or violated the provisions of Sections 10, 11 and 12 of this Ordinance, the Board may authorize the tenant of such rental unit to withhold all or a portion of the rent for the unit until such time as the rental unit is brought into compliance with this Ordinance. After a rental unit is brought into compliance, the Board shall determine what portion, if any, of the withheld rent is owed to the landlord for the period in which the rental unit was not in compliance. Whether or not the Board allows such withholding, no landlord who has failed to comply with the Ordinance shall at any time increase rents for a rental unit until such unit is brought into compliance.

"(2) A tenant may withhold up to the full amount of his or her periodic rent which is charged or demanded by the landlord under the provisions of this Ordinance. In any action to recover possession based on nonpayment of rent, possession shall not be granted where the tenant has withheld rent in good faith under this Section.

"(3) A tenant may seek injunctive relief on behalf of herself or himself to restrain the landlord from demanding or receiving any rent on the unit until the landlord has complied with the terms of this Ordinance.

"(4) A tenant may file a damage suit against the landlord for actual damages when the landlord receives or retains any rent in excess of the maximum rent allowed under this Ordinance. Upon further proof of a bad faith claim by the landlord or the landlord's retention of rent in excess of the maximum rent allowed by this Ordinance, the tenant shall receive a judgment of up to seven hundred and fifty dollars ($750.00) in addition to any actual damages.

"b. For Violation of Eviction Proceedings. If it is shown in the appropriate court that the event which the landlord claims as grounds to recover possession under Subsection 13.a.(7), Subsection 13.a.(8), Subsection 13.a.(9), or Subsection 13.a.(10) is not initiated within two months after the tenant vacates the unit, or it is shown the landlord's claim was false or in bad faith, the tenant shall be entitled to regain possession and to actual damages. If the landlord's conduct was willful, the tenant shall be entitled to damages in an amount of $750 or three times the actual damages sustained, whichever is greater.

"c. The City Attorney may bring an action for injunctive relief on behalf of the City or on behalf of tenants seeking compliance by landlords with this Ordinance.

"d. The Board may seek injunctive relief to restrain or enjoin any violation of this Ordinance or of the rules, regulations, orders and decisions of the Board.

"e. If a tenant fails to bring a civil or administrative action within one hundred and twenty (120) days from the date of the first occurrence of a violation of this Ordinance, the Board may either settle the claim arising from the violation or bring such action. Thereafter, the tenant on whose behalf the Board acted may not bring an action against the landlord in regard to the same violation for which the Board has made a settlement or brought an action. In the event the Board settles the claim it shall be entitled to retain from any payments made by the landlord, the costs it incurred in settlement, and the tenant aggrieved by the violation shall be entitled to the remainder."

[56]This section provides, inter alia, that by a specified date landlords must file a rent registration form showing rents in effect on certain prior dates for each rental unit covered by the ordinance.

those permitted under sections 11 and 12. Section 15, subdivision (a), provides for tenant-initiated remedies: under subsection (1) of that subdivision, a tenant may petition the Board for permission to withhold rent until the landlord complies with the ordinance. Subsection (2) permits the same withholding remedy, even without Board permission, and provides a defense to unlawful detainer if the tenant believes in good faith that the landlord has not complied with the ordinance.[57] Subsection (3) permits a tenant to sue for injunctive relief, and subsection (4) permits a tenant to sue the landlord for money damages.

Subdivision (c) permits the city attorney to sue landlords for injunctive relief, and subdivision (d) permits the Board to do the same. Subdivision (e) permits the Board to settle claims on behalf of tenants.

Plaintiffs focus on the rent withholding provisions of subdivision (a), subsections (1) and (2), which they claim are preempted by state law. Additionally, plaintiffs assert that subsection (2) denies them due process on numerous grounds. We address plaintiffs' due process claims first.

1. Due Process

Subdivision (a), subsection (2), allows a tenant to withhold the "full amount" of his periodic rent until the landlord's compliance with the ordinance is achieved. It provides further that "[i]n any action to recover possession based on nonpayment of rent, possession shall not be granted where the tenant has withheld rent in good faith under this Section."

a. Reasonable Relationship to the Purpose of the Ordinance

Plaintiffs first contend that the "extreme 'remedy'" of subsection (2) is not reasonably related to the purpose of the ordinance because it is available not only when a landlord charges excessive rents, but also when a landlord fails to register. As defendants observe, however, ensuring landlord registration is crucial to the purpose of the ordinance, because without registration the ordinance cannot be enforced.

Moreover, defendants note that all other enforcement remedies listed above except for subdivision (a), subsection (2), suffer the same serious weakness: to invoke them can cost substantial amounts of money, either to the tenant or to the Board. At the same time, the structure of the ordinance

---

[57]Defendants point out that although the subsection (2) remedy might be more effective, the subsection (1) remedy is available for those tenants who would hesitate to take such action without prior approval of an official agency.

makes the question of funding crucial. Section 6, subdivision (n),[58] provides that funding for the Board's expenses shall be from annual landlord registration fees,[59] and not from the city's general fund. Therefore, defendants observe, the Board is essentially dependent on landlords' registration fees to (i) pay the staff it needs to gather information for its general rent adjustment hearings under section 11; (ii) pay examiners to handle individual rent adjustment hearings under section 12; and (iii) employ counsel to bring suits under section 15, subdivisions (c) and (d), against landlords who refuse to register or who charge rents beyond the maximum allowed. On the other hand, defendants argue, the tenant-initiated remedies, with the exception of subdivision (a), subsection (2), cannot be relied on to enforce the ordinance. Although subdivision (a), subsection (1), permits a tenant to seek Board authorization to withhold rent, if landlords fail to register, the Board may lack funds to hire hearing examiners and other staff to hold hearings on such petitions. And, whereas subdivision (a), subsection (3), permits a tenant to sue for injunctive relief, there is no certainty that many tenants will expend the time or money to pursue that course. Finally, subdivision (a), subsection (4), permits a tenant to sue for damages when the landlord receives more than the maximum rent allowed by the ordinance; and subdivision (b) allows a tenant to sue for damages when the landlord violates certain restrictions on evictions; but neither section gives any remedy for the landlord's failure to register. Other provisions—section 11, subdivision f, subsection (1),[60] and section 12, subdivision f, subsection (1),[61] forbid a landlord who has failed to register—"after order of the Board"—from taking advantage of general and individual rent increases allowed by the Board. But if landlords fail to register in significant numbers, the Board might be unable to hire the staff needed to assist in issuing the "orders" required by these two subsections.

---

[58]That subdivision provides in part: "The Board shall finance its reasonable and necessary expenses for its operation without the use of General Fund monies of the City of Berkeley except as stated in this subsection, by charging landlords an annual registration fee of twelve dollars ($12.00) per unit, per year in the first year of operation. After the first year, upon request by the Board the City Council may make reasonable annual adjustments in the fee. The Board is also empowered to request and receive funding when and if necessary, from any available source, except the City of Berkeley's General Fund, for its reasonable and necessary expenses, including but not limited to salaries and all other operating expenses."

[59]The annual registration fee for the first year of operation was $12 per unit. The city council, on request of the Board, may make reasonable annual adjustments in the fee. (*Ibid.*; see Baar, *supra,* 35 Rutgers L.Rev. at p. 763, table 5.1 [comparing funding provisions of various rent control ordinances].)

[60]See *ante,* pages 687-689, footnote 44.

[61]That subdivision and subsection provide: "f. No upward adjustment of an individual rent ceiling shall be authorized by the Board under this Section if the landlord:

"(1) Has continued to fail to comply, after order of the Board, with any provisions of this Ordinance and/or orders or regulations issued thereunder by the Board . . . ."

Defendants thus proclaim the importance of the section 15, subdivision (a), subsection (2), rent withholding provision: it suffers none of the "weaknesses" discussed above; it is claimed to be simple, direct, and self-enforcing. We conclude that defendants' rent withholding provision is reasonably related to achieving the legitimate purposes of the ordinance.

### b. Vagueness

Plaintiffs next complain that section 15, subdivision (a), subsection (2), is unconstitutionally vague and overbroad. We will uphold the subsection against this challenge if it (1) gives fair notice of the practice to be avoided, and (2) provides reasonably adequate standards to guide enforcement. (*Connally* v. *General Const. Co.* (1926) 269 U.S. 385, 391 [70 L.Ed. 322, 328, 46 S.Ct. 126]; see generally Note, *The Void-for-Vagueness Doctrine in the Supreme Court* (1960) 109 U.Pa.L.Rev. 67; Note, *Due Process Requirements of Definiteness in Statutes* (1948) 62 Harv.L.Rev. 77.)

### (i) Fair Notice

Fair notice, as applied to the present inquiry, requires only that the subsection's terms be described with a reasonable degree of certainty so that an ordinary landlord can understand what conduct is proscribed on his part, and under what conditions his rent-withholding tenant will be afforded a defense to an unlawful detainer action. (Cf. *Burg* v. *Municipal Court* (1983) 35 Cal.3d 257, 270-271 [198 Cal.Rptr. 145, 673 P.2d 732] and cases cited.)

Plaintiffs contend that the subsection is ambiguous "as to the most basic components of the tenant's right to a remedy: who may take remedial action, in what amount and for how long"? We believe that the word "tenant" is clearly limited to a lessee, assignee or sublessee who has been charged excessive rent, or who lives in an unregistered apartment. Plaintiffs also claim the subsection is unclear as to who is to determine whether the landlord has violated the ordinance, and who is to determine when the landlord has achieved compliance. But we believe the answer is obvious: the trial court will determine these issues, if and when the landlord sues to evict for nonpayment of rent. Plaintiffs further claim that the subsection does not specify the amount of rent that may be withheld, but on its face the provision allows withholding "up to the full amount" of the tenant's periodic rent. Although such full withholding may be harsh, plaintiffs cannot successfully contend that it is not rationally related to achieving compliance with the ordinance.

Finally, plaintiffs claim that the subsection "condemns the landlord to an indefinite sentence" because it does not specify when, if ever, the withheld

rent shall be paid. To the contrary, subsection (2), read in conjunction with its introductory provision (subd. (a)), clearly establishes that the withholding remedy is allowed only until the landlord complies with the ordinance by registering and abiding by the maximum rent schedule that applies to him.[62] Nor do we accept plaintiffs' contention that the word "register" provides inadequate notice to landlords. That word, as well as the above terms and provisions, is sufficiently certain to inform landlords of both the conduct needed to comply with the subsection's requirements, and the circumstances that will afford his tenant a defense to an unlawful detainer action.

### (ii) Standards for Enforcement

Plaintiffs also make a cryptic allegation that the subsection's withholding provision and the qualified defense it confers are dangerously susceptible of arbitrary "enforcement" by those who have the power to invoke it—the tenants. Their concern, apparently, is with the fact that application of the subsection hinges ultimately on a tenant's "good faith belief" that a landlord has failed to comply with the ordinance.

Contrary to plaintiffs' suggestion, however, the question of the applicability of subsection (2) is not contingent on the arbitrary or personal predilections of the tenant. (E.g., *Smith* v. *Goguen* (1974) 415 U.S. 566, 573 [39 L.Ed.2d 605, 612, 94 S.Ct. 1242].) Although the "good faith belief" required to invoke the provision is not a precisely measurable standard, neither is it incapable of reasonably exact determination. The determination of whether a tenant had the requisite good faith belief at the time he withheld rent is not to be made by the tenant; it is instead a question for the trial court, to be decided only for the narrow purpose of establishing a defense to a landlord's eviction suit. Thus viewed in proper context, the provision poses little threat of arbitrary application, and hence is not properly subject to facial invalidation on this ground.

### c. Procedural Due Process and Confiscation

Plaintiffs finally claim that the ordinance provides them no "due process protection" before their rents are "confiscated" pursuant to subdivision (a), subsection (2). Viewing application of the withholding provision in the proper context, however, discloses the false assumptions underlying plain-

---

[62]Indeed, the record contains the following regulation adopted by the Board on September 24, 1980: "The remedy of rent withholding provided to tenants under 15(a)(1) and 15(a)(2) shall not be construed to relieve the tenant of the obligation to pay whatever rent is subsequently deemed lawfully owed for the time period for which the rent was withheld. This rule shall be publicized and promulgated immediately."

tiffs' concern. As noted, the applicability of the withholding provision and the qualified defense it confers comes into question only after the landlord has initiated a wrongful detainer action. The provision affords the landlord no less due process protection than he would have normally; its sole effect is to create a substantive defense to eviction for nonpayment of rent if the tenant's withholding is found to have been made pursuant to a good faith belief that his landlord had not complied with the ordinance. Similarly, the provision produces no confiscatory result: it does not deprive the landlord of rent due, because, even if it is found that the tenant withheld in good faith, the landlord may sue and recover the full amount of back rent as soon as the court is persuaded that compliance with the ordinance has been achieved. On the other hand, if it is found that the tenant's withholding was not in good faith, the landlord may recover possession in unlawful detainer and may also sue for full back rent in an amount consistent with the ordinance. We conclude that, on the face of the ordinance, the withholding and qualified defense provisions of subdivision (a), subsection (2), neither deprive landlords of due process, nor do they produce confiscatory results. (Cal. Const., art. I, § 7.) At most, the subsection creates a substantive defense to unlawful detainer actions as a means of ensuring compliance with the ordinance.

## 2. Preemption

Every California city possesses the general power to "make and enforce within its limits all local, police, sanitary, and other ordinances and regulations not in conflict with general laws." (Cal. Const., art. XI, § 7.) In addition, charter cities have even greater authority: they have exclusive power to legislate over "municipal affairs." (Cal. Const., art. XI, § 5, subd. (a).)[63] Similar to the defendant city's concession in *Birkenfeld* that "rent control is not a municipal affair as to which a charter provision would prevail over general state law" (17 Cal.3d at p. 141), defendants now do not claim that provision for rent withholding in section 15, subdivision (a), is a municipal affair that overrides general state law. Instead, defendants assert their power to implement the rent withholding provision based on the right of all cities to regulate matters not in conflict with general laws. Thus, assuming without deciding that the ordinance's rent withholding provisions do not relate to a "municipal affair," we turn to whether defendants' regulation is in conflict with, and hence preempted by, state law. (Hiscocks &

---

[63]Article XI, section 5, subdivision (a) provides: "It shall be competent in any city charter to provide that the city governed thereunder may make and enforce all ordinances and regulations in respect to municipal affairs, subject only to restrictions and limitations provided in their several charters and in respect to other matters they shall be subject to general laws. City charters adopted pursuant to this Constitution shall supersede any existing charter, and with respect to municipal affairs shall supersede all laws inconsistent therewith."

Backes, *Charter City Financing in California—A Growing "Statewide Concern"?* (1982) 16 U.S.F. L.Rev. 603, 613-614.)

 Plaintiffs first claim that general law directly conflicts with the rent withholding provisions of subdivision (a). Alternatively, they insist that rent withholding is preempted by implication in light of three statutes that are asserted to occupy the field of "when rent is due." For both contentions, plaintiffs rely exclusively on Civil Code section 1947, which provides for the timing of the payment of rent if there is no usage or contract to the contrary;[64] Code of Civil Procedure section 1161,[65] which describes the circumstances under which a tenant is guilty of unlawful detainer; and Civil Code section 1942,[66] which identifies circumstances under which a tenant may withhold rent and utilize those funds to repair deficiencies rendering the premises untenantable.

Defendants respond that these sections have nothing to do with local rent withholding provisions designed to enforce local rent control; that the withholding provisions of the ordinance do not regulate when rent is due, but instead establish a substantive defense to unlawful detainer; and that plaintiffs' cited statutes cannot be interpreted to even address, much less fully occupy, that field. Furthermore, they claim *Birkenfeld* establishes that these provisions are not preempted by state law.

a. Direct Conflict

In *Birkenfeld* we responded to three preemption arguments. The plaintiffs in that case claimed preemption of (1) the field of "rent," (2) the field of

---

[64]That section states: "When there is no usage or contract to the contrary, rents are payable at the termination of the holding, when it does not exceed one year. If the holding is by the day, week, month, quarter, or year, rent is payable at the termination of the respective periods, as it successively becomes due."

[65]That section provides: "A tenant of real property . . . is guilty of unlawful detainer: 1. When he continues in possession . . . after the expiration of the term . . . . [¶] 2. When he continues in possession . . . after default in the payment of rent . . . . [¶] 3. When he continues in possession . . . after a neglect or failure to perform other conditions or covenants of the lease . . . ."

[66]That section provides: "(a) If within a reasonable time after written or oral notice to the landlord or his agent, as defined in subdivision (a) of Section 1962, of dilapidations rendering the premises untenantable which the landlord ought to repair, the landlord neglects to do so, the tenant may repair the same himself where the cost of such repairs does not require an expenditure more than one month's rent of the premises and deduct the expenses of such repairs from the rent when due, or the tenant may vacate the premises, in which case the tenant shall be discharged from further payment of rent, or performance of other conditions as of the date of vacating the premises. This remedy shall not be available to the tenant more than twice in any 12-month period. . . . [¶] (d) The remedy provided by this section is in addition to any other remedy provided by this chapter, the rental agreement, or other applicable statutory or common law."

defenses to eviction, and (3) the field of procedural requisites to a landlord filing an eviction action. We determined that the previous ordinance's requirement of a certificate of eviction by the rent control board before a landlord was allowed to commence unlawful detainer proceedings was invalid because such a requirement would "nullify the intended summary nature of the remedy." (17 Cal.3d 129, 151.) By contrast, however, we found that although there is "extensive state legislation governing many aspects of landlord-tenant relationships, some of which pertain specifically to the determination or payment of rent" (citing, inter alia, Civ. Code, § 1942 and Civ. Code, § 1947), "neither the quantity nor the content of these statutes establishes or implies any legislative intent to exclude municipal regulation of the amount of rent based on local conditions." (*Id.* at pp. 141-142; see *Galvan* v. *Superior Court* (1969) 70 Cal.2d 851, 860-864 [76 Cal.Rptr. 642, 452 P.2d 930].)

More significant to the present question, we rejected the plaintiffs' claims that the field of defenses to eviction suits is preempted by general law. The former Berkeley ordinance limited permissible bases for eviction to specific enumerated grounds, but omitted a landlord's right to evict merely to terminate the tenancy. The ordinance thus prohibited eviction of a tenant "who [was] in good standing at the expiration of the tenancy unless the premises [were] to be withdrawn from the rental housing market or the landlord's offer of a renewal lease [had] been refused." (17 Cal.3d at p. 148.) Addressing the state law relevant to the issue, we observed that "Code of Civil Procedure section 1161, subdivision 1, makes the continuation of a tenant's possession after expiration of the term a form of unlawful detainer for which the landlord may recover possession in summary proceedings under Code of Civil Procedure section 1164 et seq. However, these statutory provisions are not necessarily in conflict with the charter amendment's provision forbidding landlords to recover possession upon expiration of a tenancy if the purpose of the statutes is sufficiently distinct from that of the charter amendment. (See *Galvan* v. *Superior Court, supra,* 70 Cal.2d 851, 859; *People* v. *Mueller, supra,* [1970] 8 Cal.App.3d 949, 954 [88 Cal.Rptr. 157].) The purpose of the unlawful detainer statutes is procedural. The statutes implement the landlord's property rights by permitting him to recover possession once the consensual basis for the tenant's occupancy is at an end. In contrast *the charter amendment's elimination of particular grounds for eviction is a limitation upon the landlord's property rights under the police power, giving rise to a substantive ground of defense in unlawful detainer proceedings. The mere fact that a city's exercise of the police power creates such a defense does not bring it into conflict with the state's statutory scheme. Thus . . . the statutory remedies for recovery of possession and of unpaid rent* (see Code Civ. Proc., §§ 1159-1179a; Civ. Code, § 1951 et seq.) *do not preclude a defense based on municipal rent control legislation enacted pur-*

*suant to the police power imposing rent ceilings and limiting the grounds for eviction for the purpose of enforcing those rent ceilings." (Id.* at pp. 148-149 (italics added)), citing *Inganamort* v. *Borough of Fort Lee* (1973) 62 N.J. 521 [303 A.2d 298, 307] and *Warren* v. *City of Philadelphia* (1955) 382 Pa. 380 [115 A.2d 218, 221].)

We believe that the above-quoted language from *Birkenfeld* disposes of plaintiffs' claim that the rent withholding provision of the ordinance directly conflicts with Code of Civil Procedure section 1161. It is true that the tenant's good faith defense conferred under subdivision (a), subsection (2), effectively eliminates one ground for eviction, but as we observed in *Birkenfeld,* this exercise of the municipality's police power does not bring the provision into conflict with state law, because the statutory remedy for recovery of possession does not preclude limitations on grounds for eviction for the purpose of enforcing a local rent control regulation.

Furthermore, we are not persuaded that the ordinance conflicts with Civil Code sections 1942 or 1947. Neither statute involves the field of defenses to eviction, or enforcement of local rent control ordinances. Section 1942 is this state's "repair and deduct statute." It specifically allows rent withholding, under certain circumstances, in order for a tenant to make needed repairs. Section 1947 merely establishes rules relating to the date at which rent is due, depending on the term of a tenant's holding. We find nothing in either section that directly conflicts with the municipal legislation at issue here. We conclude, as did the Supreme Court of New Jersey in a similar context, that merely because defendants' ordinance "imposes restraints which the State law does not, does not spell out a conflict between State and local law. On the contrary the absence of a statutory restraint is the very occasion for municipal initiative. The police power is vested in local government to the very end that the right of property may be restrained when it ought to be because of a sufficient local need." (*Inganamort, supra,* 303 A.2d at p. 307.)

b. Preemption by Implication

We will be reluctant to infer legislative intent to preempt a field covered by municipal regulation when there is a significant local interest to be served that may differ from one locality to another. (*Gluck* v. *County of Los Angeles* (1979) 93 Cal.App.3d 121, 133 [155 Cal.Rptr. 435]; Comment, *The California City versus Preemption by Implication* (1966) 17 Hastings L.J. 603, 610.) Furthermore, the mere fact that all three of plaintiffs' cited statutes concern "rent" does not assist them because "[a] field cannot properly consist of statutes unified by a single common noun." (*Galvan, supra,* 70 Cal.2d 851, 862.) ▮ A potentially preemptive "field" of state regu-

lation is "an area of legislation which includes the subject of the local legislation, and is sufficiently logically related so that a court, or a local legislative body, can detect a patterned approach to the subject." (*Ibid.*)

In *In re Hubbard* (1964) 62 Cal.2d 119 [41 Cal.Rptr. 393, 396 P.2d 809], we articulated three tests to determine in what circumstances chartered cities might be deprived of their supposed exclusive power to legislate in regard to "municipal affairs" pursuant to article XI, section 5 of our Constitution. (*Id.* at p. 128.) Although we subsequently declined to follow *Hubbard*'s approach to municipal affairs questions (*Bishop* v. *City of San Jose* (1969) 1 Cal.3d 56, 63, fn. 6 [81 Cal.Rptr. 465, 460 P.2d 137]), in *Galvan, supra,* 70 Cal.2d 851, we adopted *Hubbard*'s three tests as standards by which to judge preemption of municipal exercise of police powers pursuant to article XI, section 7. ■ The *Hubbard* factors, reincarnated as a preemption test in *Galvan*,[67] establish that we may infer an intent to preempt defendants' legislation only if " '(1) the subject matter has been so fully and completely covered by general law as to clearly indicate that it has become exclusively a matter of state concern; [or] (2) the subject matter has been partially covered by general law couched in such terms as to indicate clearly that a paramount state concern will not tolerate further or additional local action; or (3) the subject matter has been partially covered by general law, and the subject is of such a nature that the adverse effect of a local ordinance on the transient citizens of the state outweighs the possible benefit to the municipality.' " (70 Cal.2d at pp. 859-860, quoting *Hubbard, supra,* 62 Cal.2d at p. 128; see also *People* ex rel. *Deukmejian* v. *County of Mendocino* (1984) 36 Cal.3d 476, 485 [204 Cal.Rptr. 897, 683 P.2d 1150]; *Palos Verdes Estates, supra,* 142 Cal.App.3d 362, 373-374 [quoting and following *Galvan*]; *Gregory, supra,* 142 Cal.App.3d 72, 82 [quoting and following *Hubbard*]; *Bamboo Brothers* v. *Carpenter* (1982) 133 Cal.App.3d 116, 124 [183 Cal.Rptr. 748] [same]; *Music Plus Four, Inc.* v. *Barnet* (1980) 114 Cal.App.3d 113, 123 [170 Cal.Rptr. 419] [same]; *People* v. *Mueller* (1970) 8 Cal.App.3d 949, 953-954 [88 Cal.Rptr. 157] [quoting and following both *Hubbard* and *Galvan*]; Comment, *Of Lawyers, Guns, and Money: Preemption and Handgun Control* (1982) 16 U.C. Davis L.Rev. 137, 150-165 [asserting that the *Hubbard* tests are the most widely used approach to the issue of implied preemption]; cf. Rossmann & Steel, *Forging the New Water Law: Public Regulation of "Proprietary" Groundwater Rights* (1982) 33 Hastings L.J. 903, 937-942 [analyzing implied preemption under the three *Hubbard/Galvan* tests].)

---

[67]See Sato, *"Municipal Affairs" in California* (1972) 60 Cal.L.Rev. 1055, 1073, footnote 68 (*Galvan*'s preemption analysis relies on that part of *Hubbard* relating to municipal affairs).

Applying these alternative tests, we must conclude that there is no full and complete state coverage of the field of rent withholding so as to "clearly indicate" that the field "has become exclusively a matter of state concern." Neither the quantity nor the content of plaintiffs' cited statutes suggests the Legislature's intent to occupy the field of rent withholding to the exclusion of municipally created defenses to unlawful detainer actions. Nor do the three statutes suggest that the field of rent withholding is clearly a subject of paramount state interest that cannot tolerate any local involvement. Indeed, we fail to discern how defendants' withholding provisions would frustrate state statutory schemes that relate to unlawful detainer procedures, repair and deduct remedies, or that define the duration of rental periods.

Finally, existence of defendants' provisions are likely to have very little effect on transient citizens, much less an effect that outweighs the local benefit to be derived from the withholding provisions. First, many transients will not be affected by the ordinance, because it does not apply to "hotels, motels, inns, tourist homes, and rooming or boarding houses" in which "transient guests" stay for 14 days or less. (§ 5, subd. (b).) Second, to the extent that transients might be affected, the withholding provision would likely have a positive effect, because it would help assure prospective newcomers that established maximum housing rents will be enforced.

We therefore conclude that section 15, subdivision (a), subsections (1) and (2), are not preempted by state law. The ordinance's provision authorizing rent withholding and establishing a qualified defense to unlawful detainer actions regulates a field of great importance to the effective operation of defendants' rent control scheme, and one which is distinct from any other state regulation. Even assuming that state regulations touch on rent withholding, we discern no legislative intent to preempt defendants' regulation.

The judgment is affirmed. The 1982 amendment to section 14, purporting to create a presumption affecting the burden of proof, is invalid. This provision is clearly severable. (§ 16.) All other provisions of the ordinance are valid and enforceable. Each party shall bear its own costs.

Reynoso, J., Grodin, J., Cooperman, J.,* and Mills, J.,* concurred.

**BIRD, C. J.**—I agree with Part II of the majority opinion. I also agree with the substantive analysis of the antitrust issues in Part I. However, I write separately to raise a concern regarding the highly unusual manner in which the antitrust issues came before this court.

---

*Assigned by the Chairperson of the Judicial Council.

No mention of antitrust law was made by the litigants in the trial court or in the Court of Appeal below. The argument that federal antitrust law might render defendants' rent control ordinance invalid was first raised in this court, and then only *after* the decision had been made to grant a hearing. Moreover, that issue was raised by an amicus curiae rather than a party to the appeal.

A cautionary note should be sounded to dispel any belief that this court will routinely agree to address issues presented in this manner.

As the majority correctly note, the issue of whether a municipal regulation might be subject to antitrust scrutiny first arose in *Community Communications Co.* v. *Boulder* (1982) 455 U.S. 40 [70 L.Ed.2d 810, 102 S.Ct. 835]. *Boulder* was decided on January 13, 1982, a month *after* plaintiffs' closing brief had been filed in the Court of Appeal. Plaintiffs cannot, therefore, be faulted for failing to raise that issue in the trial court or in their opening and closing briefs in the Court of Appeal.

However, the Court of Appeal did not hear oral argument until July 5, 1983, a year and a half *after* the *Boulder* decision. During that entire period, neither plaintiffs nor amicus attempted to call the case to the lower court's attention—despite that court's willingness to permit additional briefing as evidenced by its acceptance as late as June 17, 1982, of a brief by amicus curiae for defendants. (See Cal. Rules of Court, rule 14(b).) The Court of Appeal was thus deprived of an opportunity to rule on that issue.

The Court of Appeal filed its now-vacated opinion on October 24, 1983. Defendants' petition for hearing was filed in this court on December 7, 1983, nearly two full years after *Boulder* was decided. Plaintiffs' answer to that petition, filed some two weeks later, *made no mention of Boulder or of the possible application of federal antitrust law to this case.* Hence, when this court granted the petition for hearing, it had not been apprised by either party that the case presented issues which, in the majority's words, would force the court to "wander off the map and travel cross country without the benefit of trail or compass." (Maj. opn., *ante,* at p. 663.) The antitrust issues were first brought to the court's attention several weeks later when amicus curiae requested leave to file a brief in support of plaintiffs.

The majority assert that consideration of the antitrust issues is nevertheless proper under several well established principles. They correctly note that on appeal from a judgment granting or denying an injunction, a reviewing court will apply the law as it stands at the time its opinion is filed. (*Cal-Dak Co.* v. *Sav-On Drugs, Inc.* (1953) 40 Cal.2d 492, 496-497 [254 P.2d 497].) They also recite the familiar rule which permits a *party* to raise on

appeal a new point of law decided while the appeal is pending. (*Claremont Imp. Club* v. *Buckingham* (1948) 89 Cal.App.2d 32, 33 [200 P.2d 47].)

However, they do not explain why the same rule should apply where, as here, the new issue is raised not by a party but by an amicus. Nor do they explain the failure of plaintiffs and amicus to request permission to file a supplemental brief in the Court of Appeal raising the new point of law. This court, overriding another Court of Appeal, has held under similar circumstances that the filing by a party of a supplemental brief provides "a satisfactory basis for the unusual practice of considering a point raised for the first time after the opening briefs have been filed." (*Meier* v. *Ross General Hospital* (1968) 69 Cal.2d 420, 423-424, fn. 1 [71 Cal.Rptr. 903, 445 P.2d 519].)

Finally, the majority cite several decisions in which this court has held that a *party* may raise a new issue on appeal if it is strictly one of law, based on undisputed facts and involving important questions of public policy. (Maj. opn., *ante,* at pp. 654-655, fn. 3.) Again, they fail to explain why the same rule should apply to an amicus curiae. More importantly, they fail to address the ramifications of permitting new issues to be raised by nonparties *after* a hearing has been granted in this court.[1]

" ' "[T]he rule is universally recognized that an appellate court will consider only those questions properly raised by the appealing parties. Amicus curiae must accept the issues made and propositions urged by the appealing parties, and any additional questions presented in a brief filed by an amicus curiae will not be considered [citations]." ' " (*Younger* v. *State of California* (1982) 137 Cal.App.3d 806, 813-814 [187 Cal.Rptr. 310]; see *E. L. White, Inc.* v. *City of Huntington Beach* (1978) 21 Cal.3d 497, 510-511 [146

---

[1]None of the cases cited by the majority involved an attempt by an amicus curiae to raise a new issue on appeal, nor does it appear that the new issues were first raised after a hearing had been granted. (*Frink* v. *Prod* (1982) 31 Cal.3d 166, 170 [181 Cal.Rptr. 893, 643 P.2d 476]; *Carman* v. *Alvord* (1982) 31 Cal.3d 318, 323 [182 Cal.Rptr. 506, 644 P.2d 192]; *UFITEC, S.A.* v. *Carter* (1977) 20 Cal.3d 238, 249, fn. 2 [142 Cal.Rptr. 279, 571 P.2d 990]; *Wong* v. *Di Grazia* (1963) 60 Cal.2d 525, 532, fn. 9, 535-541 [35 Cal.Rptr. 241, 386 P.2d 817]; *Tyre* v. *Aetna Life Ins. Co.* (1960) 54 Cal.2d 399, 405 [6 Cal.Rptr. 13, 353 P.2d 725]; *Burdette* v. *Rollefson Construction Co.* (1959) 52 Cal.2d 720, 725-726 [344 P.2d 307].)

In *Carman* v. *Alvord, supra,* 31 Cal.3d 318, several amici joined the parties in urging this court to resolve an issue first raised on appeal. (*Id.,* at p. 324.) However, the issue had been *raised* by the defendant city in its responsive brief in the Court of Appeal. (*Id.,* at p. 323.) This court concluded that the issue was properly before it under an exception to the rule that "on appeal a *litigant* may not argue theories for the first time []." (*Id.,* at p. 324, italics added.)

Cal.Rptr. 614, 579 P.2d 505]; *Eggert* v. *Pacific States S. & L. Co.* (1943) 57 Cal.App.2d 239, 251 [136 P.2d 822].)[2]

In *Younger,* the appellant attempted in his reply brief in the Court of Appeal to adopt as his own an issue first presented by an amicus curiae. The Court of Appeal refused to address the issue, reasoning that amicus had no standing to raise it and that the appellant had failed to show good reason for his failure to present the point in his opening brief. (*Younger* v. *State of California, supra,* 137 Cal.App.3d at pp. 812-814.)

The present case presents striking similarities. While plaintiffs cannot be faulted for failing to raise the antitrust issues in their opening brief in the Court of Appeal, their failure to raise them in a supplemental brief or in oral argument is unexcused. Nor do they explain their failure to raise the point in the answer to the petition for hearing, even though the legal grounds for doing so had by then existed for nearly two years.

On the basis of the arguments presented in the petition and the answer, this court voted to grant a hearing. Subsequently, amicus curiae requested leave to file its brief presenting the antitrust issues. Only then did plaintiffs jump on the bandwagon. By that time, of course, it was too late for the court to consider the possible bearing of the additional issues on its determination whether or not to grant a hearing.[3]

I do not know, of course, whether the vote on the petition for hearing in the present case might have been different had the court been apprised that

---

[2]Several exceptions have been recognized, none of which is applicable in the setting of the present case. (See *E. L. White, Inc.* v. *City of Huntington Beach, supra,* 21 Cal.3d at p. 511 [issue raised by amicus curiae considered because, on appeal from a judgment of dismissal following the sustaining of a general demurrer without leave to amend, court was required to affirm judgment if correct on any theory; appeal also presented a question of jurisdictional dimension]; cf. *People* v. *Coleman* (1942) 53 Cal.App.2d 18, 32 [127 P.2d 309] ["ignoring" general rule to permit amicus curiae to raise new objection to jury instructions in criminal appeal].)

Another exception is presented by an automatic appeal from a judgment imposing a penalty of death. In an automatic appeal, this court has a statutory duty to examine the complete record to determine whether the defendant was given a fair trial. (*People* v. *Stanworth* (1969) 71 Cal.2d 820, 833 [80 Cal.Rptr. 49, 457 P.2d 889]; Pen. Code, § 1239, subd. (b).) Accordingly, an amicus will be permitted to raise a new issue bearing on that question. (*People* v. *Easley* (1983) 34 Cal.3d 858, 863-864 [196 Cal.Rptr. 309, 671 P.2d 813] [rehearing granted to consider issues raised by amicus curiae after initial decision filed but before the opinion became final].)

[3]In this respect, the problem presented here differs from the one confronting the Court of Appeal in *Younger.* With certain exceptions, this court has discretion as to which cases it will hear. The Courts of Appeal, again with minor exceptions, must rule on all duly filed appeals from final judgments and appealable orders. (See Cal. Const., art. VI, §§ 11, 12; Cal. Rules of Court, rules 28, 29; Code Civ. Proc., § 901 et seq.; 6 Witkin, Cal. Procedure (2d ed. 1971) Appeal, § 30, p. 4045.) Hence, this court has an additional basis for insisting upon timely notification of the issues posed by an appeal.

additional issues were lurking in the shadows. However, I submit that in many cases the decision to grant or deny hearing might be heavily influenced by the court's awareness or lack of awareness of such issues—and rightly so.

This court grants only a small percentage of the petitions for hearing filed each year. Petitioners faced with that fact naturally make every attempt to present the issues posed in their appeal in the most favorable light. Troublesome or time consuming secondary issues which were argued in the courts below may be deemphasized or omitted entirely from the petition for hearing. The court is able in these instances to review the briefs filed in the Court of Appeal and the lower court's opinion to identify such hidden issues and consider them in deciding whether a hearing is advisable.[4]

Where, as here, an issue that could have been raised in the Court of Appeal is not raised until after that court has filed its opinion and after a hearing has been granted, this court is hindered in two important ways from performing its responsibilities most effectively. First, the court is denied the opportunity to consider whether hearing should be denied in light of the additional issue. Second, assuming that a hearing would have been granted in any event, the court is deprived of the lower court's views on the issue.

Accordingly, both parties and amici[5] should bear a heavy burden in this court when they attempt, after a hearing has been granted, to raise an issue which they could have raised earlier. The burden should be especially great where the issue could have been raised before the decision of the Court of Appeal became final as to that court. In all but the rarest cases, this court should refuse to consider a new issue that has been raised in such a belated manner. Otherwise, amici control the issues this court considers and decides—a most curious method of appellate review.

**LUCAS, J.**—I respectfully dissent.

In my view, and without considering any of the other substantial objections raised by plaintiff landlords, the Berkeley rent control ordinance is

---

[4]On May 6, 1985, this particular problem will be lessened considerably when a recently approved amendment to the California Constitution takes effect. (Cal. Const., art. VI, § 12, as adopted Nov. 6, 1984.) The amendment will permit this court, inter alia, to review only those issues which it considers most important in a case and leave intact the lower court's decision on all other issues. (See Legislative Analyst's Analysis, Ballot Pamp., Proposed Amend. to Cal. Const., Supreme Court: Transfer of Causes and Review of Decisions, Gen. Elec. (Nov. 6, 1984) p. 28.)

[5]The burden of satisfying the requirements for timely presentation of issues should be added to that of overcoming the well established general rule which bars amici from raising new issues on appeal. (See *ante,* at p. 711.)

invalid because it calls for the fixing of maximum rents in violation of federal antitrust law (Sherman Antitrust Act, 15 U.S.C. § 1). Indeed, the ordinance would appear to constitute a per se illegal price-fixing scheme routinely condemned by the federal courts. Accordingly, we should declare the ordinance a *nullity,* as mandated by the supremacy clause of the United States Constitution. (Art. VI, cl. 2.)

As I will demonstrate, a municipality's participation in, or approval of, a price-fixing scheme should not shield it from antitrust scrutiny. If such a scheme indeed constitutes a per se violation of the Sherman Antitrust Act, then an irreconcilable conflict exists between the municipal ordinance and federal antitrust policy which voids the ordinance under supremacy principles. (See *Rice* v. *Norman Williams Co.* (1982) 458 U.S. 654, 659-661 [73 L.Ed.2d 1042, 1049-1050, 102 S.Ct. 3294].) Such a conflict is presented here.

I. *Antitrust Scrutiny of Municipal Activity: the Background*

Not every state or local governmental activity having anticompetitive effects is invalid under the Sherman Antitrust Act. Thus, in *Parker* v. *Brown* (1943) 317 U.S. 341 [87 L.Ed. 315, 63 S.Ct. 307], the United States Supreme Court held that the federal antitrust laws do not preclude anticompetitive programs adopted and enforced *by the states* as a matter of state policy. (*Id.,* at pp. 351-352 [87 L.Ed. at p. 326].) This "state action" exemption does not extend, however, to a state's local political subdivisions (such as Berkeley) unless the state has "clearly articulated and affirmatively expressed" the anticompetitive policy being implemented by the local entity. (*Community Communications Co.* v. *Boulder* (1982) 455 U.S. 40, 54 [70 L.Ed.2d 810, 820, 102 S.Ct. 835] [hereafter *Boulder*]; see also *Lafayette* v. *Louisiana Power & Light Co.* (1978) 435 U.S. 389, 410 [55 L.Ed.2d 364, 381, 98 S.Ct. 1123] [plurality opn.].) In short, as *Boulder* established, cities, like private entities, " 'must obey the antitrust laws.' " (455 U.S. at p. 57 [70 L.Ed.2d at p. 822], quoting the *Lafayette* plurality.)

It is uncontradicted that the California Legislature has not directly spoken on the subject of rent control, much less "clearly articulated and affirmatively expressed" any policy favoring local ordinances such as Berkeley's. Defendants assert that the requisite "state policy" is evidenced by legislation calling upon local governments to assist in providing a "decent home and suitable living environment for every California family." (Health & Saf. Code, §§ 50003, 50005.) The Legislature has expressly qualified that state policy, however, by declaring that nothing in the division which contains the foregoing provisions "shall authorize the imposition of rent regulations or controls" (with exceptions not applicable here). (*Id.,* § 50202.)

Similarly, the "local planning" policy of the state (Gov. Code, §§ 65100-65761) provides that "[n]othing in this article shall be construed to be a grant of or a repeal of any authority which may exist of a local government to impose rent controls . . . ." (*Id.,* § 65589, subd. (b).) Such neutrality on the part of the state is plainly insufficient to insulate Berkeley's ordinance from antitrust scrutiny. (*Boulder, supra,* 455 U.S. at p. 55 [70 L.Ed.2d at p. 821].)

## II. *Antitrust Scrutiny of Berkeley's Ordinance*

The Berkeley rent control ordinance is *unquestionably* an anticompetitive price-fixing scheme—it imposes maximum ceilings on rents charged by private landlords. And had Berkeley's landlords privately agreed to fix maximum rents, their scheme would have been severely and speedily punished, for maximum pricing by private entities has been consistently condemned as *per se illegal* under the so-called "per se" price-fixing rule. (*Arizona* v. *Maricopa County Medical Society* (1982) 457 U.S. 332 [73 L.Ed.2d 48, 102 S.Ct. 2466] [hereafter *Maricopa*]; *Albrecht* v. *Herald Co.* (1968) 390 U.S. 145 [19 L.Ed.2d 998, 88 S.Ct. 869]; *Kiefer-Stewart Co.* v. *Seagram & Sons* (1951) 340 U.S. 211 [95 L.Ed. 219, 71 S.Ct. 487].) Does it make a difference that the price-fixing scheme attacked here is municipally sponsored?

Some cases indicate that, in determining whether to apply the "per se illegal" label to a particular restraint or scheme, we should undertake a limited inquiry into the "pernicious effects" and "redeeming virtues," if any, inherent in the challenged program. (*Continental T. V., Inc.* v. *GTE Sylvania Inc.* (1977) 433 U.S. 36, 50 [53 L.Ed.2d 568, 580, 97 S.Ct. 2549]; *Northern Pac. R. Co.* v. *United States* (1958) 356 U.S. 1, 5 [2 L.Ed.2d 545, 549, 78 S.Ct. 514]; see also *Broadcast Music Inc.* v. *CBS* (1979) 441 U.S. 1, 19-20 [60 L.Ed.2d 1, 16, 99 S.Ct. 1551].) Other cases seem to support the idea that such an inquiry is unnecessary where a maximum price-fixing scheme is involved. (See generally *Maricopa, supra,* [per se rule applied to invalidate maximum pricing arrangement in health care plan].) In any event, as I explain, Berkeley's rent control ordinance clearly has "pernicious" anticompetitive effects without any overriding "redeeming virtues."

### A. *Anticompetitive effects*

Economists are virtually unanimous in their condemnation of rent control laws. (E.g., Baird, Rent Control: The Perennial Folly (1980) pp. 54-78; Rent Control, A Popular Paradox (The Fraser Institute edit. 1975) [essays by nine economists]; Muth, *Redistribution of Income Through Regulation*

*in Housing* (1983) 32 Emory L.J. 691, 698; see also Rabin, *The Revolution in Residential Landlord-Tenant Law* (1984) 69 Cornell L.Rev. 517, 555 [quoting Ludwig von Mises' conclusion that governmental attempts to fix the price of a commodity make conditions worse].) In the view of most of these economists, rent control schemes cause what a Supreme Court plurality has called "serious economic dislocation." (See *Lafayette, supra,* 435 U.S. at pp. 412-413 [55 L.Ed.2d at pp. 382-383].)

For example, Professor Milton Friedman, writing in collaboration with Professor George Stigler, observed that "Rent ceilings, therefore, cause haphazard and arbitrary allocation of space, inefficient use of space, retardation of new construction and indefinite continuance of rent ceilings, or subsidisation of new construction and a future depression in residential building. Formal rationing by public authority would probably make matters worse." (Friedman & Stigler, *Roofs or Ceilings? The Current Housing Problem,* in Rent Control, A Popular Paradox, *supra,* p. 100.)

In addition, rent control measures bring about the very evils that have prompted the United States Supreme Court's condemnation of private maximum-price arrangements. Rent control laws cripple the economic freedom of landlords and thereby restrain their ability to sell housing in accordance with their own best judgment exercised in light of market conditions. (See *Kiefer-Stewart, supra,* 340 U.S. at p. 212 [95 L.Ed. at p. 223].) Moreover, maximum rents may be fixed too low to encourage, or even permit, landlords to furnish services or facilities deemed necessary or desirable by their tenants. (See *Albrecht, supra,* 390 U.S. at pp. 152-153 [19 L.Ed.2d at pp. 1003, 1004].) Where is the competitive incentive under a rent control scheme?

As previously indicated, just as maximum pricing of goods and services generally discourages entry into the market (see *Maricopa, supra,* 457 U.S. at p. 348 [73 L.Ed.2d at p. 61]), maximum rents have a negative impact on the production of new housing (Hirsch, *From "Food for Thought" to "Empirical Evidence" About Consequences of Landlord-Tenant Laws* (1984) 69 Cornell L.Rev. 604, 609-610; Siegan, *Commentary on Redistribution of Income Through Regulation in Housing, supra,* 32 Emory L.J. 721, 723), thereby inevitably putting an upward pressure on price as demand increases. In sum, the pernicious effects on the competitive market are many, apparent, and long-standing.

B. *Redeeming Virtues*

Does rent control have any "redeeming virtues" which would override its anticompetitive effects? Berkeley points to alleged public welfare features

which supposedly justify rent control. As I indicated above, if landlords privately agreed to fix maximum rents, their scheme *unquestionably* would be struck down as per se illegal despite asserted socially "redeeming" features, such as, for example, the financial boon to their tenants. In the private sphere, "redemption" is limited to a showing of offsetting procompetitive gains—effects on *competition* are the sole and governing consideration in such cases. (*National Soc. of Professional Engineers* v. *U. S.* (1978) 435 U.S. 679, 690-696 [55 L.Ed.2d 637, 649-653, 98 S.Ct. 1355]; see also *Continental T. V., supra,* 433 U.S. at pp. 57-58 [53 L.Ed.2d at pp. 584-585].) Does it make a difference that a city, rather than a landlord, is claiming redeeming features unrelated to competition? I certainly can see no logic in such a proposition.

To allow a local governmental entity to excuse a price-fixing scheme on the basis of asserted public health, safety or welfare considerations would enmesh the courts in an impossible task of weighing the "apples" of social welfare with the "oranges" of antitrust policy. (See *Boulder, supra,* 455 U.S. at p. 67 [70 L.Ed.2d at p. 829] [dis. opn. of Rehnquist, J.].)

Municipalities very well may be able to justify their anticompetitive programs under certain limited circumstances not involved here. Perhaps a city can point to a factor such as the existence of a "natural monopoly" (e.g., a unique resource such as a natural harbor) which requires price regulation. (See 3 Areeda & Turner, Antitrust Law (1978) ¶ 621b, at pp. 50-51; see also *Omega Satellite Products* v. *City of Indianapolis* (7th Cir. 1982) 694 F.2d 119, 127 [natural monopoly in cable television].) Other justifications doubtless exist. But dissatisfaction with the price level attained through lawful and open competition, i.e., through the normal operation of the free enterprise system, cannot justify anticompetitive price restraints of the kind imposed here. Otherwise, there would exist no practical limits whatever on the authority of a municipality to tamper with the price structure established by the open market.

Price competition is the "central nervous system of the [free market] economy." (*U. S.* v. *Socony-Vacuum Oil Co.* (1940) 310 U.S. 150, 226, fn. 59 [84 L.Ed. 1129, 1169, 60 S.Ct. 811].) Price fixing, whether privately or publicly inspired, thus endangers the free economic system to which Congress has entrusted the prosperity of the entire nation. If our 38,500 county, municipal and township governments (Bureau of the Census, Statistical Abstract of the United States (1984) at p. 294) with their broad authority for general governance "were free to make economic choices . . . without regard to their anticompetitive effects, a serious chink in the armour of antitrust protection would be introduced at odds with the comprehensive

national policy Congress established." (*Lafayette, supra,* 435 U.S. at p. 408 [55 L.Ed.2d at pp. 379-380] [plurality opn., fn. omitted].)

In my view, then, the City of Berkeley's belief that, in essence, rents were too "high" in relation to the city's tenants' ability to pay would not constitute an excuse for tampering with the free market mechanism, nor would the resultant decreased rents amount to a "redeeming virtue" overriding the anticompetitive effects of rent control. Accordingly, the ordinance was per se illegal under the Sherman Antitrust Act and should be declared invalid on that basis.

III. *The Majority's Four-part Test*

Although the challenged ordinance contemplates a per se illegal price-fixing scheme under the foregoing analysis, I observe that its invalidity would be apparent even under the majority's own novel test, an approach involving a "more accommodating standard" than the per se rule would require. (*Ante,* p. 667.)

The majority acknowledges that Berkeley's ordinance would be unacceptable if "equally effective" and "less intrusive" alternative means were available to accomplish the same result. (*Ante,* p. 678.) Yet isn't it evident that such alternative means indeed exist? If the city fathers (and mothers) believe that rents are too high in Berkeley, several solutions come to mind which would be more consistent with the operation of the free market system. *Rent subsidies* may be provided to needy tenants. *Public housing projects* may afford additional rental units. Property may be municipally acquired through *negotiated purchase or condemnation.* (See, e.g., Gov. Code, §§ 37350 [city may purchase and hold real property for common benefit]; 37350.5 [eminent domain]; Health & Saf. Code, §§ 50735-50743 [programs for low-income rental housing].)

In short, given the foregoing alternatives, why should competition between Berkeley's landlords be stifled in order to provide for the social welfare of Berkeley's tenants? Surely the "less intrusive," and "equally effective" method of accomplishing this end would be to spread the financial burden among *all* city taxpayers.

IV. *Conclusion*

The federal antitrust laws have been called the Magna Carta of the free market system. (*United States* v. *Topco Associates* (1972) 405 U.S. 596, 610 [31 L.Ed.2d 515, 527, 92 S.Ct. 1126].) These laws are as important to the preservation of market freedom as the Bill of Rights is to the protec-

tion of individual liberties. (*Ibid.*) Consistent with the overriding principle of supremacy of federal law (U. S. Const., art. VI, cl. 2), we should declare null and void the Berkeley rent control law at issue here.[1]

I would reverse the judgment and remand the case for further proceedings addressed to the antitrust issue.[2]

---

[1]Plaintiffs herein seek a declaratory judgment and injunctive relief to enjoin operation of the ordinance. Although the issue of available remedies in a federal court action was left open in *Boulder, supra,* 457 U.S. at page 56, footnote 20 [70 L.Ed.2d at p. 822], I assume that relief in state court cases such as this is limited to declaratory and injunctive relief and would preclude recovery of damages. (See *Rice* v. *Norman Williams Co., supra,* 458 U.S. at p. 658, fn. 4 [73 L.Ed.2d at p. 1049].)

[2]Application of the antitrust laws requires factual and legal determinations regarding the existence of "concerted activity" and a substantial effect upon interstate commerce. Although my view of the record suggests that both elements exist here, I would not object to a remand limited to these issues.